MERLE EVERS AND RICHARD EVERS, HER HUSBAND, PLAINTIFFS-APPELLANTS, v. KENNETH DOLLINGER, M.D., AND LIVINGSTON OBGYN GROUP, P.C., DEFENDANTS-RESPONDENTS.

Argued January 11, 1983—Decided February 8, 1984.[1]

---

[1]After a draft opinion had been prepared, plaintiffs moved the Court to withhold its opinion to permit supplementation of the record with "additional medical evidence." We address the motion and the proferred evidence in the course of our decision on the merits.

*S.M. Chris Franzblau* argued the cause for appellants (*Franzblau & Falkin,* attorneys).

*Jeffrey A. Peck* argued the cause for respondents (*Shanley & Fisher,* attorneys; *Jeffrey A. Peck* and *Stephen R. Long,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

In this medical malpractice case the trial court granted defendants' motion for judgment at the conclusion of plaintiffs' case because there was no proof of any damages proximately resulting from the defendant doctor's negligence. See *R.* 4:40–1. The Appellate Division affirmed, in an unreported opinion. We granted certification, 91 *N.J.* 523 (1982), and now reverse.

I

Because the trial court granted a judgment at the conclusion of plaintiff's [2] case, we treat plaintiff's proofs as uncontradicted, both as to liability and damages. See *R.* 4:37–2(b); *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6 (1969). Those proofs demonstrate that plaintiff first came under the care of defendant, Dr. Kenneth Dollinger, a physician specializing in obstetrics and gynecology, in about 1973. In March 1977 Mrs. Evers made an appointment for an examination by Dr. Dollinger because of her concern over a "very tiny" lump that she had felt in her right breast. Plaintiff told defendant about the lump and the pain associated with it. The doctor did a "complete examination" and told her it revealed "nothing," to "stop worrying and go home and relax." However, during the succeeding seven months plaintiff experienced worsening pain and noticed an increase in the size

---

[2]Plaintiff Richard Evers sues *per quod.* As used in this opinion, "plaintiff" refers to Merle Evers.

The only defendant involved in this appeal is Kenneth Dollinger, M.D., and reference to "defendant" is to Dr. Dollinger.

of the lump, so that by October 1977 it was about four times as large as it had been in March. In addition she noticed a "little sorelike type of thing" on her breast, with some bleeding in the area.

With mounting apprehension Mrs. Evers sought another appointment with Dr. Dollinger around the middle of October. Because he was unavailable, his partner, Dr. Ladocsi, examined plaintiff. Mrs. Evers told him about the lump and the bleeding sore. Dr. Ladocsi determined that the sore was an abscess, took a culture of it, and advised plaintiff to await the culture results before seeking a biopsy for the lump because the lump might disappear once the abscess had resolved.

Although the culture results proved "negative for infection," Mrs. Evers' fears were not allayed, so she consulted Dr. Angelo DePalo, a physician associated with Memorial Sloan Kettering Cancer Center in New York. When he examined plaintiff on October 26, 1977, Dr. DePalo discovered an infected cyst in the right nipple area as well as a mass above it. He ordered a mammogram, the results of which raised a suspicion of cancer, whereupon plaintiff was admitted to Sloan Kettering where she underwent a right extended mastectomy on October 31, 1977. A 1.5 centimeter cancerous growth was removed. The pathologist's diagnosis was of infiltrating ductal carcinoma of the right breast. Laboratory studies, x-rays and blood tests indicated that the cancer had not yet spread to any distant sites, and all lymph nodes were negative for metastasis.

As of the time of trial in May 1981 Mrs. Evers had taken no medication and had received neither chemotherapy nor radiotherapy, nor had she experienced any recurrence of the cancer. While plaintiff's appeal was pending determination in this Court, however, we were informed, through motion papers (see *supra* n. 1, at 399) that Dr. DePalo has now determined that plaintiff has experienced "distant spread of cancer from the original breast cancer * * * [,which] had metastasized"; that he found "breast cancer cells * * * in the lung"; that "Mrs. Evers

\* \* \* is faced with a terminal illness" and is "under psychiatric care"; and that she recently underwent surgery.

## II

Plaintiff instituted this action in May 1979, charging that as a result of defendant's failure to have made an accurate diagnosis and to have rendered proper treatment, her "ailment and condition became aggravated and worsened and she suffered great pain and mental anguish and will continue to do so" and her "physical and mental health were severely impaired \* \* \*." The specific allegation of malpractice revolves about defendant's failure to follow the March 1977 examination with a subsequent examination. The claim is not that absent the seven months delay in diagnosis the mastectomy would not have been required. Rather, it is that the delay itself caused both physical and emotional injury, as to both of which there was proof or offers of proof; and further that the delay enhanced the risk that the cancer would recur, requiring additional hospital and medical care—a grave and threatening circumstance that, as we now learn, plaintiff is prepared to prove has come to pass.

In support of these allegations plaintiff established at the trial, through her expert pathologist, Dr. Michael Janis, that the growth removed from Mrs. Evers' breast in October 1977 was malignant and that "for sure" it had been present in the breast in March. His testimony likewise permitted the reasonable inference that the tumor's size increased between the time of Dr. Dollinger's first examination and the subsequent surgery. Further, Dr. Janis concluded that plaintiff was suffering from infiltrating ductal carcinoma, a form of cancer that infiltrates or spreads into the ductal tissue beyond the site of the original tumor.

Finally, in the course of an extended colloquy out of the jury's presence, Dr. Janis explained a significant statistical phenomenon: that of those patients who have the type of breast cancer from which Mrs. Evers suffered, one out of every four will

experience a recurrence of the disease. Whereas it is impossible to forecast *which* patients will be stricken, the statistical fact is that it will be one in four. This statistical risk of 25% is applicable to patients who had been accurately and promptly diagnosed and treated. Dr. Janis asserted that if there were a seven months delay, as was here the case, there would be "more of a chance" that the patient would fall into the 25% category.

To much the same effect was a report, marked for identification, of plaintiff's examining physician, Dr. Sam Lan. The report was supplied to defense counsel as part of pretrial discovery, *R.* 4:17–4(e). In addition to establishing defendant's deviation from accepted standards of medical care, Dr. Lan was prepared to testify that

[a]ssuming the presence of a clinically palpable lump as claimed by the patient at her initial office visit, it is my opinion that the chances of a distant spread of the cancer was increased as a result of the delay of 7 months between the time the patient first saw Dr. Dollinger and the time surgery was performed. The extent to which the patient was endangered cannot be assessed from the [medical records and depositions of plaintiff and Drs. Dollinger and Ladosci].

The trial court refused to admit into evidence the material contained in the foregoing proffers of proof because the experts were unable to quantify the increased risk of recurrence of cancer, holding that "it has to be more probable than not or within a reasonable degree of medical probability that, as a proximate result of any malpractice * * * [plaintiff] would fall within the 25 percentile." Faced with this ruling, which made evidence of quantification of the increased risk indispensable to plaintiff's claim of injury, plaintiff's attorney made a proffer that Dr. Lan, who was scheduled to appear the following day, was now prepared to testify that "because of the delay with a reasonable degree of medical probability, Mrs. Evers would fall into the 25 percentile." However, defendant objected to the proffer on the ground that in his report Dr. Lan was unable to determine the magnitude of the risk of recurrence and distant spread of the cancer. The report had concluded only that the delay had "increased" the risk. Ruling that Dr. Lan could not

testify beyond his report, the trial court then granted defendant's motion for judgment. In a conclusion adopted by the Appellate Division, the trial court ruled that although plaintiff's offer of proof on the alleged deviation from accepted medical standards of care would have created a jury question, there was nevertheless "no showing of any damages proximately flowing from that deviation."

We are satisfied that in the circumstances of this case it was error to enter judgment for defendant at the close of plaintiff's proofs. First, there was uncontradicted evidence that the malignant breast tumor actually increased in size because of the delay. Further, the disease had developed beyond the site of the original tumor itself into an infiltrating ductal carcinoma. Although claims for these specific injuries may not have been made in *haec verba,* they were clearly embraced within the four corners of the complaint and there was no objection to their admission on the ground that they went beyond answers to interrogatories. Hence, those proofs alone demonstrated sufficient physical injury to withstand defendant's motion. Beyond that, plaintiff was prepared to show that she suffered anxiety, emotional anguish and mental distress. These were attributable not solely to her having the cancer but also to the growth of the tumor during the time proper treatment was withheld and from the realization, following the confirmation of her malignancy, that defendant's delay in her treatment had increased the risk that she would again fall victim, perhaps fatally, to the disease.

Finally, it is now clear that on remand plaintiff will be prepared to prove that the seven months delay increased the risk of recurrence and that such increased risk was a substantial factor in bringing about the condition from which plaintiff now suffers, or, put differently, that the harm of which there was but increased risk has now become a reality. Hence, we need not determine whether the unquantified (and unquantifiable) but nevertheless certain increase in the risk, standing alone, is sufficient injury to sustain plaintiff's cause of action.

## III

█ The most patent form of medical injury in this case relates to the growth of the malignant tumor itself. Mrs. Evers testified that she first discovered the lump in her breast in February 1977. Alarmed, she immediately arranged to see Dr. Dollinger. Following her examination by defendant in March 1977 and her discharge with the assurance that the lump was "nothing," she observed that the lump continued to grow to at least four times in size by the following October. As noted, plaintiff's expert also corroborated the fact that the malignancy grew and had become an infiltrating ductal carcinoma when finally surgically removed and identified. This progressive evolution of the malignancy during the period of delay until plaintiff received proper medical attention, occasioned by defendant's earlier failed diagnosis, is a cognizable injury and constituted an actionable element of damages.

In *Cloys v. Turbin,* 608 *S.W.*2d 697 (Tex.Civ.App.1980), the court reversed a summary judgment in favor of defendant in plaintiff's action for medical malpractice. Defendant allegedly had failed to biopsy a mole-like growth on plaintiff's left arm that three months later was diagnosed as malignant melanoma. Plaintiff alleged that defendant's negligence "was a proximate cause of the malignant melanoma remaining, growing, and spreading in her body, of its not being removed at the earliest possible time * * *." *Id.* at 699. The defendant's expert concluded that plaintiff suffered no compensable damages as a result of defendant's negligence, asserting that, based upon reasonable medical probability, the malignant melanoma did not spread to other parts of plaintiff's body during the three months delay in diagnosis, since lymph nodes in the permanent section were negative. *Id.* at 700. The court rejected this explanation, stating that

it does not negate the possibility, specifically alleged in plaintiff's first amended petition, that the tumor on her arm grew during this period, at least by some

imperceptible amount. Accordingly, we hold that an increase in size, no matter how small, would constitute sufficient actual damages to sustain the element of injury in Mrs. Cloys' cause of action. [*Id.* at 701.]

Here, the malignant tumor grew significantly, not imperceptibly, during a seven months delay attributable to defendant's malpractice. Plaintiff clearly established that defendant's failure to diagnose the tumor prevented her from undergoing a mastectomy to excise the tumor at the earliest opportunity in 1977. As a proximate result of this malpractice, the tumor remained, grew, and spread in her body. An increase in the size of a malignant tumor, by definition, results in the spread of cancer cells into once healthy tissue, and therefore is an injury in and of itself.[3]

■ The concession on the part of plaintiff that a mastectomy would have been necessitated even if the malignancy had been promptly diagnosed does not derogate from the fact that the malignancy was *not* promptly diagnosed. As a proximate result of that dereliction by defendant, the tumor not only remained in her body, it grew in size. Plaintiff was unquestionably more

---

[3]Closely related to the fact that the tumor increased in size as a result of the seven months delay is the additional circumstance that diagnosis of the cancer when it was finally revealed was that of infiltrating ductal carcinoma. According to plaintiff's expert, this indicated that "there was a tumor inside the ducts of the breast which spread beyond the duct and infiltrated into the surrounding tissue." Infiltrating ductal carcinoma indicates a spread of cancer outside the ducts where the disease originated, and is considered a graver condition than intraductal carcinoma. Feig, Schwartz, Nerlinger & Edeiken, "Prognostic Factors of Breast Neoplasms," 133 *Radiology* 577, 578 (1979) [hereinafter cited as Feig]; see also Silverberg and Chitale, "Assessment of Significance of Proportions of Intraductal and Infiltrating Tumor Growth in Ductal .Carcinoma of the Breast," 32 *Cancer* 830, 834 (1973) (finding that mortality increased as progressive proportions of infiltrating to intraductal growth were attained. "The prognosis is excellent—with no known cancer deaths—for pure intraductal carcinoma, not quite as good for tumors with less than 10% infiltration, worse for tumors in the broad range of 10–89% infiltration, and significantly poorer still for tumors showing 90–100% infiltration.").

seriously diseased as a result of the growth of the malignancy.[4] This constituted actionable harm proximately caused by defendant's alleged malpractice according to a standard of reasonable medical probability. It was error on the part of the trial court to fail to recognize this form of injury as a compensable element of damages.

## IV

An additional element of injury and damage derives from plaintiff's claims of anxiety, emotional anguish and mental distress. It will be recalled that plaintiff's complaint charged that as a result of defendant's failure to have made a timely and accurate diagnosis and render proper treatment, her "ailment and condition became aggravated and worsened and she suffered great pain and mental anguish, and will continue to do so" and her "physical and mental health were severely impaired * * *." In response to interrogatories Mrs. Evers detailed present mental distress subsequent to her mastectomy, manifested in "insomnia, weight gain, and fatigue." She also claimed dermatological problems as well as a periodic twitch and pain in the left eye caused by stress.[5] This emotional upset was

---

[4]Delay in treatment almost invariably results in a more serious prognosis. *Clinical Onocology for Medical Students and Physicians* at 41 (P. Rubin 3d ed. 1970–1971) ("Even in breast cancer, while it is difficult to show by *overall* figures that early diagnosis improves prognosis, there is definitely a higher prognosis associated with small tumors and limited or no ancillary node involvement. Both of these must be related to the passage of time. * * * Generally, the larger the tumor of a given organ, the worse the prognosis." (emphasis in original)); Feig, *supra,* 133 *Radiology* at 578 ("The correlation between tumor size and prognosis has been repeatedly demonstrated in numerous clinical studies. * * * Patients with smaller lesions have a much greater likelihood of long-term survival."); see also *Diagnosis and Treatment of Breast Cancer* at 21 (Lewison, Montague, Williams & Wilkins eds. 1981).

[5]This information was furnished by counsel at the Court's request following argument. It is mentioned simply to show that defendant cannot fairly assert that plaintiff did not present a claim for mental and emotional injury as a result of his malpractice upon her.

borne out by Mrs. Evers' testimony at trial concerning her unrelieved state of anxiety and fear over the growing, untreated tumor, as well as her anger and hostility towards defendant after her tumor was finally diagnosed. At trial the plaintiff was prevented from presenting effectively and fully the evidence relating to her mental and emotional condition.[6]

 On retrial plaintiff should be permitted to present her claims based on mental and emotional injury. Certainly compensable injury in the form of mental pain and suffering in a context of medical malpractice is not new. *West v. Underwood,* 132 *N.J.L.* 325 (E. & A.1945). Damages for Mrs. Evers' emotional and mental suffering should be awarded upon proof that this distress resulted from defendant's negligent failure to diagnose her tumor and effectuate prompt and proper treatment. *See id.* at 326. "[C]ourts have come to recognize that mental and emotional distress is just as 'real' as physical pain, and that its valuation is no more difficult." *Berman v. Allan,* 80 *N.J.* 421, 433 (1979); *see Schroeder v. Perkel,* 87 *N.J.* 53 (1981). Such distress could well encompass concerns over the anticipated future consequences of malpractice. *See, e.g., Carter v. Public Serv. Coord. Transp.,* 47 *N.J.Super.* 379 (App.Div.1957) (plaintiff entitled to damages for personal injuries including anxiety and worry over possible injuries to her unborn child as the result of her own physical injuries when she fell while attempting to climb steps to board a bus, even though her baby was born normal and healthy three weeks later); *Friel v. Vineland Obstetrical & Gynecological Ass'n,* 166 *N.J.Super.* 579 (Law Div.1979) (awarded damages to a mother for the mental distress over possible brain damage to her child as well as damages to the mother for her own physical injuries proximately resulting

---

[6]The trial court restricted testimony of conversations between the plaintiff and others concerning her tumor to the mere physical fact of its existence. Such conversations were relevant and admissible as evidencing Mrs. Evers' state of mind and mental suffering. *McCormick, Evidence* § 294 at 695 (E. Cleary 2d ed. 1972); *R.* 63(12)(a).

from defendant's malpractice in causing plaintiff's child to be prematurely delivered, despite the fact that the harm of brain damage to the child would remain speculative for three to five years).

▇ Plaintiff's claim for mental and emotional suffering from delayed diagnosis and treatment will not be diminished or defeated by a demonstration that delay itself was not the cause of her ultimate physical injury. In *Ciluffo v. Middlesex Gen. Hosp.*, 146 *N.J.Super.* 476 (App.Div.1977), the trial court's dismissal of plaintiff's claim against a physician for physical and emotional damages suffered because of a delay in treatment of less than twenty-four hours was reversed, even though plaintiff's experts could not establish proximate cause between defendant's negligent delay in diagnosing and treating plaintiff's neck injury and the subsequent complications suffered by plaintiff. The court observed:

> Certainly the jury could have reached the logical conclusion that plaintiff's recovery, hence her pain and suffering, was prolonged by the period of time before proper treatment was undertaken. Although plaintiff proved no other consequences of this delay, she was entitled to be compensated for the pain and suffering endured for the period of the delay, if she proves that Dr. Maddatu was negligent and if plaintiff has not already received full compensation from the settling tortfeasor for all her injuries. [*Id.* at 481.]

*See also Marek v. Professional Health Servs., Inc.*, 179 *N.J.Super.* 433 (App.Div.1981) (plaintiff's x-ray was negligently read as negative when in actuality it disclosed an early, treatable stage of lymphatic cancer. About a year later, plaintiff's disease process was diagnosed as "a Stage 4 diffuse, well-differentiated lymphocytic lymphoma," considered a terminal phase as the result of widespread metastasis. The court upheld plaintiff's recovery for the physical disability and pain and suffering during his lifetime resulting from a delayed diagnosis and treatment).

Plaintiff projected a plausible claim for compensation attributable to emotional and mental injury. The trial court erred in discounting and rejecting evidence of such injury.

## V

Plaintiff's evidence of physical injury proximately caused by defendant's malpractice included the growth in size of the tumor and, arguably, the infiltration or the increased infiltration of plaintiff's cancer into the ducts surrounding the original cancer site. In addition to compensation for these physical injuries, Mrs. Evers also should be able to receive damages for any resultant emotional anguish and mental distress. She has, unfortunately, since the trial and while this appeal was pending, allegedly suffered a recurrence of life-threatening cancer, as revealed by the certification annexed to plaintiff's motion "for a hearing before the Trial Judge to determine the adequacy of the newly discovered evidence for a new trial", with this Court "to retain jurisdiction * * * until such time as findings of fact are returned" to us. The certification is by plaintiff's attorney and contains the information about the recurrence and progression of plaintiff's cancer as recited *supra* at 403.

Because of our determination that there must be a retrial, we consider the motion technically moot.[7] We would be remiss,

---

[7] Whether "increased risk," standing alone, is an actionable element of damage in a malpractice case is a provocative question the determination of which we leave for an appeal that requires, as this case does not, the answer.

One commentator suggests that the increased risk need not be quantified in order to calculate compensation for the *loss* of the chance of surviving. King, "Causation, Valuation & Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences," 90 *Yale L.J.* 1353 (1981). His illustrations reveal, however, that the harm for which he advocates redress is not the increased risk *per se,* but rather a harm such as death or bodily injury occasioned in part by the increased risk. A patient who dies from a heart attack, writes King, would have a cause of action against the physician who had misdiagnosed the condition, even though the patient would have had only a 40% chance of survival with a timely diagnosis. King would award compensation equal to 40% of the value of the victim's life had he lived. *Id.* at 1382.

See also *Jordan v. Bero,* 158 *W.Va.* 28, 210 *S.E.2d* 618 (1974), in which the court found excessive a jury verdict for the father of a ten-year-old boy who was hit by a car while bicycling. In the course of its opinion, the court

however, were we to close our eyes to the contents and import of the certification, containing representations made to us by an officer of the Court. This is so not only because of the interests at stake and the extraordinary nature of the circumstances, but particularly because the role of "increased risk" will doubtless be prominent in the retrial, and the trial court and counsel are entitled to our guidance.

Courts have come to recognize that the difficulties of identifying, defining, and proving injury in certain types of medical malpractice cases justifies the application of a standard of causation that is more flexible than that used in conventional tort claims. *See, e.g., Jones v. Montefiore Hosp.,* 494 *Pa.* 410, 431 *A.2d* 920 (1981); *Gradel v. Inouye,* 491 *Pa.* 534, 421 *A.2d* 674 (1980); *Hamil v. Bashline,* 481 *Pa.* 256, 392 *A.2d* 1280 (1978).[8]

---

reaffirmed the rule that future damages are not compensable unless proven to a reasonable degree of medical certainty.

Justice Neely, though concurring in the result, differed with the majority about the standard for future damages. 210 *S.E.2d* at 640–41. He criticized the majority's rule as being rooted in an earlier time of less familiarity with probability and statistics. *Id.* at 640. In its place, Justice Neely proposed what he called "The Lady or the Tiger Rule," referring to the story of the young man who was placed in the arena by an evil king and forced to choose one of two doors, behind one of which was a beautiful woman and behind the other a ferocious, hungry tiger:

[I]t is possible to conceptualize the possibility of future medical expenses as a separate injury, in very much the same way that requiring a man to stand in the arena and open one of two doors is in and of itself a separate injury.

\* \* \* \* \* \* \* \*

Therefore, in a hypothetical case, if a man can demonstrate that there is a twenty percent probability that he will have future injuries which would, if they occurred, result in damage to him in the amount of a hundred thousand dollars, he should be able to recover twenty thousand dollars from the defendant, which recovery would represent the injury of incurring a twenty percent probability of suffering one hundred thousand dollars worth of damages. [*Id.* at 64, 210 *S.E.2d* at 640–41.]

[8]For an exhaustive discussion of *Hamil v. Bashline, supra,* as well as other pertinent authorities, see *Herskovits v. Group Health,* 99 *Wash.2d* 609, 664 *P.* 2d 474 (1983), and *id.* at 619, 664 *P.2d* at 479 (Pearson, J., concurring), *id.* at

In *Hamil, supra,* the Supreme Court of Pennsylvania confronted the issue, in a case of wrongful death from a heart attack, of whether the relationship between increased risk of harm and the decedent's death was sufficient to hold defendant hospital responsible. Plaintiff's decedent, suffering from chest pains, was transported to the hospital, where he received negligent treatment in the emergency unit. Plaintiff's expert witness testified that had the hospital rendered proper treatment, the decedent would have had a 75% chance of surviving the heart attack he was experiencing when admitted to the hospital. Defendant, whose expert witness testified that the patient would have died regardless of any treatment provided by the defendant hospital, argued that plaintiff had failed to make out a *prima facie* case because of the absence of proof that defendant's negligence did, within a reasonable degree of medical certainty, cause decedent's death. Citing the *Restatement (Second) of Torts* § 323(a) (1965) [9] as authority for relaxation of the degree of certitude usually required before plaintiff's evidence can make out a jury question, the court held that when there is evidence that a defendant's negligent act or omission increased the risk of harm to one in the plaintiff's position and

---

636, 664 *P.*2d at 487 (Brachtenbach, J., dissenting), *id.* at 642, 664 *P.*2d at 491 (Dolliver, J., dissenting).

[9]*Restatement (Second) of Torts* § 323(a) provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increased the risk of such harm
* * * .

This section and its predecessor have been a fixture in our law for more than twenty years, although not in the context of a medical malpractice case. See *Brooks v. New Jersey Mfrs. Ins. Co.,* 170 *N.J.Super.* 20 (App. Div.), certif. den., 81 *N.J.* 413 (1979); *Jackson v. New Jersey Mfrs. Ins. Co.,* 166 *N.J.Super.* 448 (App.Div.), certif. den., 81 *N.J.* 330 (1979); *Viducich v. Greater N.Y. Mut. Ins. Co.,* 80 *N.J.Super.* 15 (App.Div.), certif. den., 41 *N.J.* 129 (1963).

that the harm was in fact sustained, "it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." 481 *Pa.* at 269, 392 *A.*2d at 1286.

The *Hamil* court took pains to distinguish the facts of that case from the more routine tort case, in which the law requires proof that the result complained of probably would not have occurred "but for" the negligent conduct of the defendant. A conspicuous feature of *Hamil,* and of the case before us, is that defendant was charged with having failed in a duty to protect against harm from another source; hence the fact-finder must consider not only what *did* occur but also what *might have* occurred:

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable. Nevertheless, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) [of *Restatement (Second) of Torts*] tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof. [*Id.* 481 *Pa.* at 271, 392 *A.*2d at 1287–88 (footnote omitted).]

The *Hamil* court held that once a plaintiff has demonstrated that a defendant's negligent act or omission has increased the risk of harm to another and that the harm was in fact sustained, such evidence is sufficient to create a jury question as to whether the increased risk was in turn a substantial factor in producing the resultant harm.

The Pennsylvania court applied this analysis in a cancer malpractice case, *Gradel v. Inouye, supra,* 491 *Pa.* 534, 421 *A.*2d 674, in which plaintiff alleged that in early fall of 1964 defendant failed to take reasonable steps to diagnose and remove lumps from her child's forearm. Plaintiff consulted another doctor who in November 1965 detected and removed a cancerous mass in the child's bone. Unfortunately, the cancer's recurrence at that site necessitated amputation in December 1966. Plaintiff's medical expert testified that a biopsy should have been performed much earlier and that the defendant's failure to have diagnosed the fibrosarcoma (cancer of the bone) allowed it to

invade the bone and become a substantial factor in the loss of the arm. Finding for plaintiff, the *Gradel* court noted:

> [M]edical opinion need only demonstrate, with a reasonable degree of medical certainty, that defendant's conduct *increased the risk* that the harm sustained by plaintiff would occur. The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm. * * * In [plaintiff's expert's] opinion, * * * if the fibrosarcoma had been [detected and] removed earlier, the recurrence which necessitated the amputation would have been less likely. We conclude that the expert medical testimony here constituted sufficient evidence from which the jury could have found that [defendant's] negligence was a substantial factor in producing the harm. [*Id.* at 544–545, 421 *A.2d* at 679 (emphasis in original, citation and footnote omitted).]

The Pennsylvania Supreme Court again addressed the issue of causation in connection with a case in which plaintiff alleged that defendant had failed properly to diagnose and treat her breast cancer. In *Jones v. Montefiore Hosp., supra,* 494 *Pa.* 410, 431 *A.2d* 920, defendants either failed to remove the mass in plaintiff's breast during a scheduled biopsy or to diagnose and treat a later discovered mass. Almost two years later, the mass was diagnosed as cancer and removed in a modified radical mastectomy. By that time the cancer had metastasized to a lymph node. There was expert testimony that even if the mass had occurred after the original biopsy, if it had been diagnosed and removed earlier, probably the cancer would not have metastasized or spread to a lymph node. The court characterized this inference as reasonable.

> From this evidence, the jury might well have concluded that the failure either to remove the *original mass or to properly test and treat a new mass prevented* early detection and thereby increased the risk of mastectomy or, at the very least, increased the risk that cancer would metastasize. [*Id.* at 419, 431 *A.2d* at 925.]

The court concluded that the jury should have been instructed to impose liability if it decided that defendant's negligent conduct increased the risk of harm and that such increased risk was a substantial factor in bringing about the harm actually inflicted upon plaintiff, "whether or not the medical testimony as to

causation was expressed in terms of certainty or probability."
*Id.* at 418, 431 *A.2d* at 924.

The foregoing authorities, which we view as persuasive, find
their provenance in *Hicks v. United States,* 368 *F.2d* 626 (4th
Cir.1966), involving an action under the Federal Tort Claims Act
for damages resulting from the death of a 25-year-old woman
from an undiagnosed bowel obstruction. Plaintiff's action was
grounded in the theory, supported by uncontradicted expert
testimony, that if operated on promptly, the decedent would
have survived. Defendant argued that there was insufficient
evidence that the admittedly erroneous diagnosis was a proxi-
mate cause of the decedent's death, and that even if surgery had
been performed immediately, it would amount to no more than
speculation to say that it would have been successful. Rejecting
that argument the Court of Appeals, in a passage frequently
quoted, said:

> When a defendant's negligent action or inaction has effectively terminated a
> person's chance of survival, it does not lie in the defendant's mouth to raise
> conjectures as to the measure of the chances that he had put beyond the
> possibility of realization. If there was any substantial possibility of survival and
> the defendant has destroyed it, he is answerable. Rarely is it possible to
> demonstrate to an absolute certainty what would have happened in circumstanc-
> es that the wrongdoer did not allow to come to pass. The law does not in the
> existing circumstances require the plaintiff to show to a *certainty* that the
> patient would have lived had she been hospitalized and operated on promptly.
> [328 *F.2d* at 632 (emphasis in original).]

■ Applying the principles extracted from these cases, we
hold that on remand plaintiff should be permitted to demon-
strate, within a reasonable degree of medical probability, that
the seven months delay resulting from defendant's failure to
have made an accurate diagnosis and to have rendered proper
treatment increased the risk of recurrence or of distant spread
of plaintiff's cancer, and that such increased risk was a substan-
tial factor in producing the condition from which plaintiff
currently suffers. We hold further that *Restatement (Second)
of Torts* § 323(a) is applicable to medical malpractice cases.

Reversed and remanded.

HANDLER, J., concurring.

In this difficult cancer malpractice case the Court has ruled that the trial court, and the Appellate Division affirming, erred in refusing to recognize that plaintiff Merle Evers, victimized by defendant's failure to make a prompt and effective diagnosis of her malignancy, had proved substantial consequential injuries. The Court has decided that it was error to enter judgment for defendant at the close of plaintiff's proofs since plaintiff had established sufficient evidence of physical injury. The uncontested evidence that the physical enlargement of plaintiff's malignant breast tumor as well as the infiltration or increased infiltration of the cancerous cells into the ducts surrounding the original site of the tumor arguably constitute injuries proximately caused by defendant's negligence. The Court also recognized that plaintiff was prepared to prove, and should have been permitted to prove, that she suffered anxiety, emotional distress and mental anguish as a result of her realization that defendant's misdiagnosis and the resulting delay in proper treatment increased the risk that she would suffer a life-threatening recurrence of cancer. I subscribe completely to these conclusions.

It would follow from these determinations alone that plaintiff is entitled to a remand and a retrial with the opportunity to establish these damages. I therefore find great significance in the Court's additional conclusion concerning another element of damages that will be available to plaintiff on the remand. The Court concludes that plaintiff is entitled to prove that defendant's alleged negligence in delaying proper treatment resulted in an increased risk of metastasis and that such increased risk was a substantial factor in bringing about plaintiff's post-trial recurrence of cancer. Since at this time the potential harm attributable in part to defendant's malpractice has actually occurred in a form of metastasis capable of clinical detection, the Court is willing to permit consideration of the unquantified increased risk of such harm as an element of damages. The Court accepts the application of *Restatement (Second) of Torts* § 323(a) (1965)

to this kind of medical malpractice case, reducing plaintiff's burden of proof to a threshold of substantial likelihood, that is lower than the traditional standard of reasonable medical probability (*Coll v. Sherry,* 29 *N.J.* 166, 175 (1959)).

I fully endorse these holdings. Actual increased risk of harm, even though not measurable or quantifiable, in the context of medical malpractice is sufficiently demonstrable to justify its recognition as a compensable form of injury. The relaxation of plaintiff's burden of proof under these circumstances to allow the recognition of and redress for such injury fairly and justly ameliorates the traditional burden of proof that would render establishment of this kind of injury unnecessarily difficult.

Because in this case, as it has unfolded during the pendency of the appeal, the increased risk—the possibility of cancer recurrence—"has now become a reality," the Court feels it "need not determine whether the unquantified (and unquantifiable) but nevertheless certain increase in the risk standing alone, [*i.e.,* without a recurrence of cancer] is sufficient injury to sustain plaintiff's cause of action." *Ante* at 406; 412 n. 7. Perhaps not. However, when this case was tried, the harm from the increased risk had not yet become a reality. Many cancer patients whose condition has been made worse because of an unreasonable delay in proper diagnosis and treatment may not have suffered an ultimate harm when they realize they have been the victims of malpractice. I think it is therefore entirely appropriate and extremely needful that this issue—whether such an increased risk of an ultimate harm may constitute a compensable injury even though that harm has not yet eventuated—be addressed.

I

At the outset, it is important to point out that even if plaintiff were not otherwise entitled to a remand and retrial, the subsequent recurrence of cancer following the trial itself justifies the grant of a new trial. The Court considers that the question

raised by plaintiff's motion for a new trial on the ground of the post-trial recurrence of cancer may be "technically moot" because plaintiff is otherwise entitled to a remand, *ante* at 412. However, the question of whether this recurrence of cancer standing alone would merit a retrial clearly ought to be resolved. This situation can arise in countless cases involving malpractice. Further, the increased risk of harm complete with the recurrence of cancer is now recognized by the Court as a relevant additional injury on the remand even though it has occurred after the trial.

Mrs. Evers was clinically cancer-free at the time of her trial in May 1981, three and one-half years after she underwent a radical mastectomy in October 1977. However, according to the motion brought by her attorney on this appeal, by July 1983 she had suffered a recurrence of cancer, clinically verified by breast cancer cells found in her lung, some six years after her original surgery and more than two years after trial.

Such evidence, which is the subject of plaintiff's motion for a new trial, should be regarded as newly discovered evidence. *R.* 4:50–1(b). Clearly the continued existence or presence of cancerous cells in her body, following corrective surgery, was not discoverable or previously known. Presumably, available scientific and medical technology was incapable of detecting such underlying cancer or micrometastasis. Consequently the recurrence of cancer should be regarded as newly discovered evidence when it is clinically diagnosed. Because the recurrence of cancer is the exact harm that she risked suffering as a result of defendant's malpractice, it is a significant consequential injury that should be included in an assessment of plaintiff's total damages. This evidence is unquestionably highly relevant to plaintiff's cause of action and damages claims. Recognition of such evidence as within the purview of *R.* 4:50–1(b) would then allow in a single action all relevant and material elements of injury and damages, including those related to the recurrence of

the cancer and the unquantified enhancement of risk of that harm.

## II

I consider that the linchpin of the Court's explication of the nature and scope of legally cognizable medical injury in a case such as this, involving negligent delay in the proper treatment of cancer, is the actuality of an increased risk of a recurrence of the cancerous condition. The Court recognizes in this case that as a result of the malpractice, Mrs. Evers did in fact suffer an actual increased risk that the cancer would recur, demonstrated wholly apart from the fortuitous circumstance that subsequent to the trial plaintiff again fell victim to the cancer. *Ante* at 406. However, such enhancement of risk is recognized by the Court as a compensable injury only because plaintiff has experienced a recurrence of cancer. The Court rules that this evidence—the increased risk of harm plus the harm itself—may be proved at a new trial in which the damages issues will have been expanded in light of changed circumstances.

I do not dispute the significance of resultant harm in the overall analysis of medical injury and assessment of damages. I do not believe, however, that such resultant harm constitutes a *sine qua non,* a condition precedent before there can be recovery for an actual albeit unquantified increase in the risk of such harm. The Court is here troubled by a seeming inability to quantify the risk of future cancer. But, adding the incurrence of future harm as a requirement for the recovery for such increased risk does not resolve the dilemma since the risk still remains unquantified. Yet, insistence that the harm occur as a condition for recovery does unfortunately add greatly to the legal burdens of cancer victims. The inadvertent effect of such a court rule is that those victims, who undeservedly have been put in greater peril in terms of their survival, are not permitted to be compensated for this peril unless they have suffered a resurgence of their cancer.

Medical science itself cannot quantify the increased risk of cancer in such victims.[1] Nevertheless, medical science does acknowledge the existence of an increased risk. This should be sufficient to satisfy the standard of reasonable medical probability that we generally recognize. *Coll v. Sherry, supra,* 29 *N.J.* at 175.

In this case, it was established that, without any negligence on the part of the doctor in treating plaintiff, she was exposed to at least a 25 percent risk or probability that she would again become a cancer victim. Thus, plaintiff should be required to prove only that defendant's malpractice and the resultant delay in receiving proper treatment increased the probability that she would fall into the 25 percentile of persons who suffer recurrence. Stated somewhat differently, the plaintiff should be required to prove simply that (1) absent defendant's malpractice she had a 25 percent chance of suffering a recurrence of cancer and (2) because of defendant's malpractice, there is a probability greater than 25 percent that she will suffer such a recurrence and a concomitant diminishment of her chance of survival.

I approve of the Court's reliance on the Pennsylvania line of cases recognizing that the complexities of certain medical malpractice actions require a more flexible standard of causation than conventional tort claims. This is appropriate in order to prevent a tortfeasor from being unfairly insulated from the real but elusive consequences of his negligent conduct. A tortfeasor should not be allowed to escape responsibility for causing an increased risk that would not have existed but for his negligence simply because of the statistical uncertainty of the risk.

---

[1] In this case, for example, plaintiff's cancer cells found first in the original breast tumor have now migrated to the lung, according to the certification annexed to plaintiff's motion for a new trial. Despite a pathology report negative for metastasis at the time of plaintiff's radical mastectomy almost six years earlier, this recurrence accentuates the inadequacy of medical science to detect micrometastasis—the clinically undetectable spread of cancer—and thus statistically assess increased risk, as well as emphasizing that this risk is absolutely real though eluding quantification.

> Such cases by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person- may be held liable. Nevertheless, in order that an actor is not completely insulated because of uncertainties as to the consequences of his negligent conduct, Section 323(a) [of *Restatement (Second) of Torts* (1965)] tacitly acknowledges this difficulty and permits the issue to go to the jury upon a less than normal threshold of proof. [*Hamil v. Bashline*, 481 *Pa.* 256, 271, 392 *A.2d* 1280, 1287–88 (1978) (footnote omitted).]

*See also Jones v. Montefiore Hosp.,* 494 *Pa.* 410, 431 *A.2d* 920 (1981); *Gradel v. Inouye,* 491 *Pa.* 534, 421 *A.2d* 674 (1980), applying this principle to cancer medical malpractice cases.

The Pennsylvania court in *Hamil* held that unquantified increased risk due to defendant's negligence is an actionable injury once the harm has in fact ensued; if the jury determines that the increased risk was a substantial factor in producing the actual harm, the plaintiff will prevail. While the cited cases relied on by the Court have all involved situations where such future harm in fact occurred, that circumstance should not be regarded as indispensable in demonstrating the existence of medical injury. The significance of these decisions is that once the basic fact that the risk had increased to some degree had been proved to a reasonable medical probability, none required the increased risk of future cancer attributable to a defendant's malpractice be measured or quantified.

In *James v. United States,* 483 *F.Supp.* 581 (N.D.Cal.1980), the court viewed the unquantified loss of the chance of survival caused by delayed treatment as constituting compensable injury in and of itself even while the plaintiff remained alive. In *James,* plaintiff's chest x-ray and radiologist's report disclosing an abnormality were inadvertently filed without being reviewed by the examining physician of plaintiff's prospective employer. Two years later plaintiff was diagnosed as having lung cancer. Plaintiff's experts concluded on the basis of the tumor's size that it had probably metastasized since the negligent oversight and that earlier radiation treatment would have decreased its size and reduced the risk of metastasis. *Id.* at 587. Although plaintiff continued to live, the court awarded damages for the

unquantified but actual increased risk of death, as well as the accompanying mental anguish arising from the awareness of this increased risk.

> As a proximate result of defendant's negligence, James was deprived of the opportunity to receive early treatment and the chance of realizing any resulting gain in his life expectancy and physical and mental comfort. No matter how small that chance may have been—and its magnitude cannot be ascertained—no one can say that the chance of prolonging one's life or decreasing suffering is valueless. [*Id.* at 587.]

The increased risk of a recurrence of cancer due to delayed treatment is so obvious that it is a cruel irony to insist that a cancer victim again be stricken in order to receive just compensation for medical injuries. In this case, the medical testimony of the increased risk of future cancer was unimpugned. This medical testimony established that plaintiff was at a greater risk of future metastasis on account of the delay in receiving proper treatment. As recapitulated by the Court, both plaintiff's medical experts were of the opinion that defendant's malpractice—the untimely diagnosis and the delayed treatment of the malignancy—increased the chances that plaintiff would suffer a recurrence of the cancer. *Ante* at 404–405.

Harm in the form of increased risk of future cancer attributable to delay in diagnosis and treatment has become so widely accepted by the medical community that the existence of such harm could be reasonably inferred from this professional common knowledge. A survey of the medical literature indicates that it is universally agreed within the medical community that delay in cancer diagnosis and treatment usually increases the risk of metastasis.[2] Thus, the inference of harm from delayed

---

[2]Examples of the acceptance of this knowledge within the medical community are numerous; experts continuously urge vigilant detection as the most realistic means of improving prognosis, *viz: Clinical Oncology for Medical Students and Physicians* at 33 (P. Rubin 3d ed. 1970–1971) ("*The passage of time versus the spread of tumor:* Most specialists in clinical cancer feel very strongly that the earlier one makes a diagnosis of cancer, the greater is the chance for cure . . . . [I]n breast cancer we do know that: 1. The bigger the tumor, the worse the prognosis . . . . Both of these factors are related to the

treatment would be permissible, aside from expert testimony explaining the etiology or physiological nature of such harm. *See Buckelew v. Grossbard*, 87 *N.J.* 512, 528–29 (1981) (Testimony of plaintiff's expert witness created a permissible inference of negligence on the basis that his opinion represented the "common knowledge within the medical community that the type of accident that took place in this case does not ordinarily occur in the absence of the surgeon's negligence" and such knowledge was based on experience rather than intuition.). Indeed, the Court, pursuant to *Evid.R.* 9(2)(e), arguably could take judicial notice of this literature and the evidential inferences which it generates. *See Calabrese v. Trenton State College*, 82 *N.J.* 321, 325 (1980) (Existence and extent of the risk of harm involved in administering a series of anti-rabies injections could be established by use of medical reports of treating physicians, medical depositions, and use of extensive medical literature pursuant to *Evid.R.* 9(2)(e), providing for judicial notice of "specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources of reasonably indisputable accuracy."); *see also James v. United States, supra,* 483 *F.Supp.* at 586 ("Plaintiff may

---

passage of time. This concept of 'the earlier the better' is the basis for attempts at the early diagnosis of cancer."); Dohrmann, McDermott & Price, "Symptom Duration, Tumor Staging and Survival in Patients with Carcinoma of the Breast," 154 *Surgery, Gynecology, and Obstetrics* 707 (1982) ("Earlier treatment is generally believed to improve survival prospects in patients with carcinoma of the breast."); *Id.* at 710 ("Cancer specific survival time was better for the total patient series and for those treated by potentially curative operation when symptoms had been present for one week or less as compared with those who had symptom duration of six months or more, $p = 0.007$. Survival prospects were also better in those patients who had symptoms from one week to one month as compared with those who had six months or more symptom duration, $p = 0.005$. These results indicate that patients in whom diagnosis is made and operation performed early in the symptomatic phase of carcinoma of the breast have less advanced tumors and better survival prospects.").

demonstrate the benefit of earlier treatment in his case by relying on general theories of appropriate medical treatment.").

Further, common knowledge and informed lay testimony can augment the opinion of medical experts concerning the relationship of delayed diagnosis and treatment to the spread of cancer. Information about this causal relationship is widely disseminated.[3] The general public accepts the causal relationship between delay in treatment and metastasis; it understands the official and popular vocabulary of urgency stressing the imperative of early detection to prevent metastasis. Indeed, this common knowledge is endorsed and encouraged by the medical profession itself.[4] Whether such information is accurately absorbed by the

---

[3] *U.S. Dept. of Health and Human Services, The Breast Cancer Digest* 95 (1980) alludes to communication efforts for mass audiences, as well as the results of a study in 1977 comparing the effectiveness of alternative breast cancer public education programs. *See also Cancer Control* at 60 (I. Kessler ed. 1980) which refers to programs advocating early diagnosis sponsored by the American Cancer Society during the last 25 years. The messages are universal, *e.g.,* "For these reasons cancer research scientists have long looked for methods of detecting or finding breast cancer early in its growth before it has had a chance to spread to other parts of the body." *National Cancer Institute, Breast Exams: What You Should Know* 1 (1981); "The real hope for the future is in earlier detection . . . . At present, the key to saving more lives from breast cancer is earlier detection and treatment." *American Cancer Society, Inc., Facts on Breast Cancer* 14 (1982); "At the beginning, cancer cells usually remain at their original site, and the cancer is said to be localized . . . . If left untreated however, the cancer is likely to spread throughout the body." *Id.* at 4; "Because with each stage a case of cancer becomes progressively serious, it is important to detect cancer as early as possible." *Id.* at 4; "The therapeutic consequence of the detection of a tumor in Stage I is that, if it can be located, removal would prove truly curative." *Cancer Control, supra* at 59; "Until breast cancer can be prevented, the greatest hope for its control is early detection, diagnosis, and treatment." *The Breast Cancer Digest, supra* at 17.

[4] One of plaintiff's experts, Dr. Janis, stated at deposition in this case: "I have to tell you *what everybody, including a layman knows,* namely, that one can expect a complete cure of cancer with surgery only if the tumor is completely removed before it spreads to distant sites [metastasis]. The longer a malignant tumor remains in the body, the greater the chances of

average person or not, it can be used by fact-finders in their consideration of the existence and nature of injury. *See Klimko v. Rose,* 84 *N.J.* 496, 503–04 (1980).[5]

In a case such as this, the medical evidence as reflected by the experts at trial and in discovery, as well as that available through published medical literature and the common knowledge of the general public, serves to establish that plaintiff was at a greater risk of future metastasis on account of the delay in receiving proper treatment. This conclusion is strengthened by the evidence in this case of the concomitant growth in the size of the tumor during the time proper treatment was withheld from the plaintiff, which growth alone the Court properly recognizes as a compensable form of injury. *Ante* at 407–409.

There is clearly a correlation of size and prognosis—between the increase in the size of a malignant tumor and the increased risk of metastasis. The Court acknowledges that this increase in the size of the tumor during the delay in proper treatment attributable to defendant's malpractice is negatively related to prognosis.[6] *Ante* at 409 n. 4. The same logic and common

---

metastasis." (Emphasis added). This testimony was heard by the judge outside the presence of the jury.

[5]The use of common knowledge may be particularly apt in the cancer field. Radiation therapy for cancer is an example of the expansion of the doctrine of common knowledge. *Compare* an earlier case, *Dietze v. King,* 184 *F.Supp.* 944, 946 (E.D.Va.1960) (effects of radiation therapy not within common knowledge) *with* a later decision, *ZeBarth v. Swedish Medical Center,* 81 *Wash.*2d 12, 20, 499 *P.*2d 1, 7 (1972) ("high voltage radiation in the treatment of cancer has been widely enough and long enough employed in this country to allow the jury to find that, within the experience and observation of mankind, myelopathy or paralysis ordinarily will not result from its use . . . ."); Dahlquist, "Common Knowledge in Medical Malpractice Litigation: A Diagnosis and Prescription," 14 *Pac.L.J.* 133, 135 n. 4 (1983).

[6]This correlation is so strong that even patients such as plaintiff whose lymph nodes were negative for metastasis at the time of her mastectomy may have no better chance for survival than patients whose cancer has already metastasized into the lymph nodes. The risk of recurrence is frequently more affected by the size and growth of a malignancy, correlated with delayed

sense that allows an award of damages for unquantified increased risk to cancer victims who exhibit positive lymph nodes at the time of surgery or thereafter (*see Jones v. Montefiore Hosp., supra,* 494 *Pa.* 410, 431 *A.*2d 920) justify damages to plaintiffs who also have established an identical increased risk but whose lymph nodes are negative for metastasis.[7]

The following observation was made in a somewhat variant context raising similarly perplexing problems in understanding the nature of physical and psychic injury and the appropriate assessment of damages:

> Indeed, the collective wisdom of the community on the proper redress for a particular harm, informed by experience, common sense, and a desire to be fair to the parties, seems an acceptable way of arriving at a damage verdict and probably one that is preferable to a more scientific (and sterile) process that

treatment, than it is to actual metastasis at the time of detection. *See, e.g.,* Fracchia, Rosen & Ashikari, "Carcinoma of Breast Without Axillary Lymph Node Metastasis," 151 *Surgery, Gynecology & Obstetrics* 375, 376 (1980) ("Recurrence was more frequent with an increase in size of the primary carcinoma. Usually, the survival rate paralleled the frequency of recurrence, and both were associated with tumor size . . . .") This is true even as to a person, like plaintiff, whose lymph nodes were negative for metastasis. *Id.* at 377 ("The likelihood of recurrence among patients with negative [lymph] nodes, was directly related to the size of the primary tumor, being less with smaller carcinomas and more frequent with larger lesions. In this respect, patients with, or without metastasis, in the axillary lymph nodes are similar.").

[7]In this case, it is logical that unquantified increased risk of metastasis is also compensable as a future consequence of the existent harm of the enlarged tumor, even without the post-trial recurrence of cancer. Once she has proved actual harm, plaintiff's action for damages for future metastasis is analogous to the Pennsylvania case cited by the Court that awarded damages not only for an unquantified increased risk of harm that was a substantial factor in bringing about the resultant harm, according to *Restatement (Second) of Torts* § 323(a), but also for unquantified future risk resulting from that harm. "[A] doctor properly may be allowed to explain the possible future effects of an injury, and with less definiteness than is required of opinion testimony on causation. Consequently, it was not improper for the jury to consider the possibility of future metastasis in awarding damages." *Gradel v. Inouye, supra,* 491 *Pa.* at 546, 421 *A.*2d at 680.

excludes nonquantifiable elements to achieve an aura of objectivity and precision. [Capron, "Tort Liability in Genetic Counseling," 79 *Colum.L.Rev.* 618, 649 (1979) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 *U.S.* 555, 563, 51 *S.Ct.* 248, 250, 75 *L.Ed.* 544 (1931)).]

In my opinion there was an ample evidential basis in this case at the time of trial for recognizing the unquantified increased risk of future cancer as a compensable form of medical injury and an element of damages independent of an actual recurrence of cancer. The expert opinion in this case is buttressed by the shared understanding of the medical profession itself and comports with the common knowledge and experience of the public-at-large. The widespread acknowledgement of this unquantified increased risk of future metastasis due to delayed diagnosis and treatment and its critical correlation with growth in size of a malignancy, which is recognized by the Court as an actionable claim, justifies awarding damages notwithstanding the absence of an absolute quantification that is beyond the current capacity of science.

Failure to do otherwise is grossly unfair to cancer patients victimized by medical malpractice. It deprives them of rightful compensation while burdening them with the need to pursue multiple and successive claims. By insisting that the harm be incurred before entitlement to a claim exists, no action for an actual but unquantified enhancement of risk could be brought before that unforeseeable time when a plaintiff experiences a recurrence of disease. Such a rule may very well force a plaintiff to engage in multiple suits in order to recover adequate damages for all injuries proximately attributable to the medical malpractice. No sound policy is served by needlessly encouraging successive actions based upon a single tort, with the consequent potential for complexity of issues, duplication of claims, and confusion in results. *Cf. Alfone v. Sarno,* 87 *N.J.* 99 (1981) (Although parties and interests are different in decedent's own personal injury suit and wrongful death action, defendant should be required to litigate only once the substantive issues

deriving from a single act of negligence, and elements of damages should not be duplicated.).

For these reasons, I write separately while concurring in the judgment of the Court.

HANDLER, J., concurring in the result.

*For reversal and remandment*—Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.