222 N.J. Super. 545 (1988)
537 A.2d 745
ANTHONY PELOSE AND ROSE PELOSE, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
ROBERT E. GREEN, M.D., LEO KELLY, JR., M.D., ABC, DEF, AND JOHN DOES I THROUGH XV, FICTITIOUSLY DENOMINATED, WHOSE IDENTITIES ARE PRESENTLY UNKNOWN. DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 2, 1988.
Decided February 16, 1988.
*547 Before Judges PRESSLER, BILDER and MUIR, Jr.
Marc E. Lesser argued the cause for appellants (Kronisch, Schkeeper & Lesser, attorneys; Marc E. Lesser and Myron W. Kronisch, on the brief).
Myron J. Bromberg argued the cause for respondent Robert E. Green, M.D. (Porzio, Bromberg & Newman, attorneys; Myron J. Bromberg, of counsel; Myron J. Bromberg and Lisa Murtha, on the brief).
Robert P. McDonough argued the cause for respondent Leo Kelly, Jr., M.D. (McDonough, Murray & Korn, attorneys; Robert P. McDonough, of counsel; Dolores M. Filandro, on the brief).
The opinion of the court was delivered by BILDER, J.A.D.
This is an appeal from the dismissal of a medical malpractice case at the end of plaintiffs' case. The facts relevant to this appeal can be simply and briefly stated.
Defendants, Dr. Robert Green, a neurosurgeon, and Dr. Leo Kelly, Jr., an orthopedic surgeon, performed a cervical laminectomy on plaintiff Anthony Pelose. Dr. Green was the principal surgeon; Dr. Kelly assisted. As the assistant, Dr. Kelly not only assisted in peripheral matters (tying knots, cutting, suturing, suctioning blood, retracting muscles, and the like) but actively participated in removing lamina from the spinal column. Plaintiff developed quadriparesis (weakness of all four limbs).
*548 Plaintiff's expert, Dr. Charles Fager, a neurosurgeon, testified (by way of deposition) that the condition resulted from the operation and was caused by surgical trauma to the spinal cord during the operation; that Dr. Kelly lacked sufficient expertise to perform a cervical laminectomy and deviated from acceptable medical standards by actively engaging in crucial aspects of the laminectomy (removal of the lamina)[1]; and that Dr. Green deviated from acceptable medical standards by allowing Dr. Kelly to assist in such a manner. When asked whether this negligence (i.e., Dr. Kelly's participation) was within reasonable medical probability, a proximate cause of and a substantial factor in plaintiff's quadriparesis, Dr. Fager said:
Yes, I believe that [it] did ... sustain some damage to the spinal cord, some surgical damage during this operation.
While it is unclear from this answer whether Dr. Fager was saying that Dr. Kelly's participation was a proximate cause of the damage to plaintiff's spinal cord, we assume for the purpose of this appeal that he was saying that. See Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).
The trial judge granted a motion to dismiss at the end of plaintiff's case. On appeal plaintiff makes the following contentions:
POINT I
THE TRIAL JUDGE FAILED TO CONSIDER THE LEGITIMATE INFERENCES AS TO CAUSATION ARISING FROM (a) DR. KELLY'S TOTAL LACK OF SKILL; and (b) FROM THE STRICKEN EVIDENCE OF DR. FAGER'S EXPERIENCE WHEN ALL TRAUMA WAS ELIMINATED.
POINT II
DR. KELLY'S LACK OF SKILL INCREASED THE RISK OF QUADRIPARESIS, WHICH OCCURRED, THUS PRESENTING A PRIMA FACIE CASE UNDER RESTATEMENT (SECOND) OF TORTS § 323(a).

*549 POINT III
DR. FAGER'S OPERATIVE RESULTS WERE RELEVANT AS TO THE WEIGHT TO BE GIVEN HIS OPINION ON CAUSATION.
Judge Coburn dismissed the complaint because he found that while there was evidence that it was malpractice for a surgeon of Dr. Kelly's qualifications (or lack thereof) to have actively participated in the removal of the lamina, there was no evidence that he had caused any harm to plaintiff. We agree  substantially for the reasons given in his oral opinion of December 11, 1986.

I.
As Judge Coburn noted, Dr. Fager was unequivocal in his opinion that there was no malpractice if the unfortunate result came about because of Dr. Green's surgical activity. Dr. Fager acknowledged that this was a dangerous and difficult procedure in which increased neurological deficits occur in 10% of the cases  and, indeed, with severe myelopathy[2] in 14% of the cases. While acknowledging other possible causes for plaintiff's quadriparesis[3], Dr. Fager testified that the major cause is surgical damage to the spinal cord in attempting to remove the bone  i.e., trauma from the rongeur or the lamina, the latter either being moved against the cord or moving by way of rebound  and expressed an opinion that surgically induced trauma was the cause in plaintiff's case.
Even if we assume that Dr. Fager was correct in his opinion that plaintiff's condition was caused by surgically induced *550 trauma[4], which we do for the purpose of this appeal, there was no evidence that the trauma was caused by Dr. Kelly. As we have noted, Dr. Fager was unequivocal in his view that there was no negligence if it was caused by Dr. Green  it is something that happens under the best of conditions; it is a significant risk of the operation. Dr. Fager's opinion as to causal relationship was predicated on his opinion that the trauma was caused by Dr. Kelly and that in turn was predicated solely on the fact Dr. Kelly was not qualified to do a cervical laminectomy.
The mere fact that he participated in the laminectomy during crucial parts of the operation to me indicates that he did damage the cord.
....
Knowing ... that Doctor Green has done this operation a number of times ... that he has expertise in this area, that he is skillful in this area ... it would be my feeling that it's far less likely that the damages came from Doctor Green's surgery than from Doctor Kelly's surgery.
Dr. Fager acknowledged that he could not identify what happened with any particularity:
I can't tell you at what point the cord was injured.
....
I can't tell you at some particular point Dr. Kelly put a rongeur in and bruised the spinal cord. I wasn't there. I can't tell you that ... I can't tell you that at some particular moment his instrument may have slipped against the spinal cord.
He could only say it was caused by surgical trauma and since Dr. Kelly lacked the expertise, he caused it. This is no more than speculation  speculation surrounded by expertise but, nonetheless, speculation. Interestingly enough, Fager himself recognized this.
There's no way that I can speculate as to exactly when and how this injury occurred. I can only say that on the basis of my experience ... this unfortunate result comes about from surgical trauma to the spinal cord.
*551 He acknowledged that it could happen even in the hands of an experienced neurosurgeon and could have happened when Dr. Green was operating. Mere guess or conjecture is not a substitute for legal proof. See Joseph v. Passaic Hospital Assn., 26 N.J. 557, 575 (1958); also State v. Fritz, 105 N.J. 42, 64 (1987). Plaintiff did not meet his burden of showing that the deviation was a proximate cause of his condition. See Germann v. Matriss, 55 N.J. 193, 208 (1970).

II.
In addition to arguing that Dr. Fager's conclusion resulted from and is supported by logical inferences from the evidence, plaintiff contends that the difficulty in identifying the negligent causative act in this case justifies the application of a more flexible standard of causation set forth in 2 Restatement, Torts 2d, § 323(a) at 135 (1965). See Evers v. Dollinger, 95 N.J. 399, 412-417 (1984). Section 323(a) provides:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increased the risk of such harm....
Here again, we agree with Judge Coburn. Section 323(a) is not applicable. That section assumes a nexus between the increased risk and the negligence has already been established  it does not create that nexus. Here, as noted, there was no evidence Dr. Kelly failed to exercise reasonable care in the manner he performed the procedures.
Section 323(a) is a more flexible standard for "identifying, defining and proving injury" in cases where there has been negligently caused injury but the extent of that injury cannot be quantified. See Evers, supra at 408, 413-417. It finds particular application where a failure to diagnose or a misdiagnosis clearly delayed proper treatment, but the resulting harm cannot be quantified. These are cases in which it cannot be determined with any assurance what the ultimate course of the disease would have been for the particular patient with earlier *552 more appropriate treatment. For instance, a woman with breast cancer caught early and appropriately treated may have a 95% chance statistically of complete recovery but 5% do die. Nonetheless, the statistical relationship has meaning, a meaning which is given practical effect by Evers and the cases discussed therein. Ibid. Section 323(a) applies when we know there was negligently caused harm but we cannot tell the extent of that harm  either because the total harm has not yet occurred (we only know the statistical chances have changed)[5] or because harm has occurred but we cannot tell how much of the harm was caused by the negligence (except to the extent we statistically meet "the cancer would have spread anyhow" argument).

III.
Plaintiffs finally contend that the trial judge erred in excluding Dr. Fager's testimony with respect to his experience in his operations over the past years. He argues that the testimony supported Dr. Fager's testimony that surgical trauma produces post-operative increased neurological deficit. While Dr. Fager's experience and the results of his new techniques might have had relevance to that question, the value of that evidence was clearly outweighed by the risk the jury would be misled into believing a failure to use his technique was a deviation from acceptable medical standards. See Evid. R. 4. The trial judge's ruling on this score was not an abuse of discretion. Of more importance, however, is that what plaintiff sought to show, i.e. that his quadriparesis was caused by surgically induced trauma, has been accepted for the purpose of this opinion.
Affirmed.
NOTES
[1] Dr. Kelly was an experienced orthopedic surgeon fully qualified to perform lumbar (low back) laminectomies; however, he had no post-residency experience with cervical (neck) laminectomies, which because of the presence of more critical nerves and a more crowded operative field is a far more difficult and dangerous procedure.
[2] Plaintiff had a degenerative condition in his cervical spine in which there was an overgrowth of bone closing around his spinal cord. This crowding of the spinal cord was, as explained by Dr. Fager, myelopathy.
[3] Other causes might be injury due to hyperextension of the neck during intubation by the anesthesiologist, post-operative blood clot, hematoma or thrombosis, or even unknown etiology.
[4] Given the alternative possibilities, it would appear this conclusion is speculative and a net opinion.
[5] We recognize the Supreme Court left this application open, see Evers 95 N.J. at 412 n. 7. Our reference here is not intended as an expression of a view with respect thereto but, for purposes of completeness, as a reference to the possible applications.