116 N.J. Super. 29 (1971)
280 A.2d 843
LOIS SCOTT AND WILLIAM SCOTT, PLAINTIFFS-APPELLANTS,
v.
SALEM COUNTY MEMORIAL HOSPITAL, DEFENDANT, AND JEROME COTLER, M.D., AND BASIL INGEMI, M.D., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 1971.
Decided June 3, 1971.
*30 Before Judges LEWIS, MATTHEWS and MINTZ.
Mr. Marvin D. Perskie argued the cause for appellants (Messrs. Perskie & Perskie, attorneys).
Mr. Carl Greenberg argued the cause for respondents (Messrs. Porzio, Bromberg & Newman, attorneys).
*31 The opinion of the court was delivered by LEWIS, P.J.A.D.
Plaintiffs Lois Scott (herein plaintiff) and William Scott, her husband, appeal from an adverse judgment of the Law Division entered upon a jury verdict of no cause for action in favor of defendants, Medical Doctors Jerome Cotler and Basil Ingemi, from the denial of their motions for a new trial and from the denial of their application to take additional testimony from defendant Cotler and the wife and the sister-in-law of the jury foreman, James Beck, in connection with a charge of improper communications with the jury. The Salem County Memorial Hospital (hospital) was also a party defendant, and in a bifurcated trial on the issue of liability, the jury returned a verdict against it in favor of plaintiffs. The hospital did not appeal.
We recite only the essential facts that appear in the record. About 6 P.M. on July 16, 1966, plaintiff, a 42-year-old woman, was accidentally knocked down by a boy carrying a football. She was immediately taken to the hospital where she was examined by Dr. Cotler, the Chief of Orthopedics of the Medical Staff. He recalled that plaintiff related that there was an "audible snap" and that she experienced "painful deformity of the right lower leg, inability to aright or ambulate." He diagnosed her condition as a "closed comminuted fracture right tibia and fibula" with marked displacement. The doctor treated her fractures by a closed reduction and applied a "snug, long leg" plaster cast extending from plaintiff's groin to the toes of her right foot.
On the following day, Sunday, July 17, plaintiff complained to her husband, her roommate and the hospital nurses that the cast was tight and uncomfortable and that she wanted relief. By 3 P.M. she could not move her toes. Although two "house physicians" (neither of whom was licensed as a medical doctor by the State of New Jersey) viewed her leg and conferred about it, they did nothing to relieve her. That night, plaintiff's husband spoke to the *32 desk nurse and was informed that neither Dr. Cotler nor his partner, Dr. Ingemi, was immediately available.
Prior to leaving plaintiff on Saturday, July 16, Dr. Cotler left instructions on the hospital chart that he was to be notified if any problems developed. The doctor was on call Sunday, but neither he nor Dr. Ingemi visited plaintiff that day. On Monday, July 18, Dr. Cotler left on a vacation and, by pre-arrangement, his partner, Dr. Ingemi, assumed the care of all their patients, including plaintiff, whose medical status he had previously discussed with Dr. Cotler.
On Monday morning, Dr. Ingemi received a telephone call from a hospital nurse concerning plaintiff's condition, which had so deteriorated that there was no motion or sensation in her toes. The doctor ordered the cast to be split to the mid-tibia and the immediate administration of medication. Later that day, Dr. Ingemi personally attended plaintiff; the cast was then split to the knee and further medication was administered.
Subsequently, following a consultation with Dr. John Reinhardt, the Chief of Surgery of the hospital, plaintiff's right leg, which had developed gangrene, was amputated below the knee.
At the trial, plaintiffs' experts, Doctors Raymond Tronzo and Robert Tuby, testified that the critical day in the treatment of plaintiff was Sunday, July 17, and that the loss of plaintiff's leg was attributable to the defendants' failure to timely bivalve the cast to release the pressure created by edema and the failure to remove the cast or its top portion promptly upon the initial manifestation of circulatory embarrassment. Dr. Tronzo opined that the most propitious time for relieving plaintiff was on Sunday. He and Dr. Tuby agreed that plaintiff's condition was irreversible after the expiration of a 12 to 16-hour period without blood circulation and that defendants were negligent in failing to examine their patient on Sunday and Monday morning.
*33 Defendants disputed this ascription of negligence. However, when Dr. Ingemi was questioned as to why he did not ask another doctor to look at plaintiff's foot in order to determine whether his telephonic direction of Monday morning to bivalve the cast to the mid-tibia was sufficient, he replied, "it was my responsibility." It is also noteworthy that defendants conceded that a tight cast could have caused gangrene. Nevertheless, they took the position that plaintiff's problem was occasioned by an injury to the nerves or vascular system at the time of her accident. Significantly, however, Dr. Cotler's initial examination of plaintiff revealed no evidence of such injury.
Plaintiffs predicate their appeal on the following grounds: (1) the trial court failed to deliver a charge to the jury, as requested, on the law of concurrent negligence; (2) the verdicts were inconsistent and against the weight of the evidence; (3) there were improper, irregular, direct and indirect communications to and within the jury, and the refusal of the trial judge to allow a more extensive inquiry with regard to these communications constituted prejudicial and reversible error; (4) the trial court erred in ordering a bifurcated trial; (5) there was an abuse of judicial discretion in not allowing counsel to conduct voir dire and in deleting proposed questions to prospective jurors; (6) substantial prejudice resulted from the manner in which the jury was selected, and (7) the trial judge erred in disallowing rebuttal evidence respecting expert testimony.
We are satisfied that justice mandates a retrial of this case. In the circumstances, the instructions to the jury should have included, as requested, a charge with respect to concurrent negligence. The mere statement by the court that all defendants might be jointly liable could have easily been understood by the jury to mean that all defendants were to be held liable if the negligence of each could have or did produce the injury by itself. "The law of negligence recognizes that there may be two or more concurrent and directly cooperative and efficient proximate causes of injury." *34 Menth v. Breeze Corporation, Inc., 4 N.J. 428, 442 (1950). Nevertheless, these acts need not of themselves, be capable of producing the injury; it is enough if they are "a substantial factor" in bringing it about. See Rappaport v. Nichols, 31 N.J. 188, 203 (1959), quoted with approval in Titus v. Lindberg, 49 N.J. 66, 76 (1967). Also see Robbins v. Thies, 117 N.J.L. 389, 394 (E. & A. 1937), and Peer v. Newark, 71 N.J. Super. 12, 28 (App. Div. 1961), certif. den. 36 N.J. 300 (1962).
The trial judge also erred in unduly restricting the cross-examination of Dr. Cotler by plaintiffs' counsel with respect to a treatise entitled Watson-Jones on Fractures and Injuries which the doctor had indicated was a recognized, standard authority on the subject. See Ruth v. Fenchel, 21 N.J. 171, 176-79 (1956); Swank v. Halivopoulos, 108 N.J. Super. 120, 125 (App. Div. 1969), certif. den. 55 N.J. 444 (1970).
The record reveals that after the trial, Mrs. Nolan, a juror, informed the trial court, in substance, that (1) upon the jury's commencement of deliberation, the jury foreman, James Beck, said that "[t]he judge would be very angry if we brought back a quick, you know, disposition of this case"; (2) a newspaper clipping or clippings were read and discussed in the jury room; (3) juror Newhard, who has a brother-in-law who is a doctor and two sisters who are nurses, suggested that malpractice insurance rates were rising because of "cases like this"; (4) a court attendant told the jury to "hurry up"; (5) the heat in the jury room was so oppressive that one juror fainted, and (6) Beck received a communication from his sister-in-law, who was a patient of Dr. Cotler, that the doctor advised him to be strong-willed. Parenthetically, at this juncture, we note that the respective verdicts in favor of the doctors and against the hospital were 10-to-2, and that jurors Beck and Newhard not only voted in favor of the doctors but were the two jurors who voted to relieve the hospital of liability.
*35 Pursuant to R. 1:16-1, the trial judge interrogated the jurors individually, in camera, concerning the asserted claims. A transcript of the proceedings discloses that, to a large extent, these charges, repeated in the testimony of Mrs. Nolan, were not fully substantiated by the remaining jurors. While Mrs. Nolan demonstrated disappointment in the verdict and was "inflamed," there were certain aspects of her testimony that had a ring of truth and were persuasively corroborated.
There is no doubt that a newspaper article with respect to the death of the brother of plaintiffs' counsel had been circulated among the jurors; in the circumstances of this case, we deem this irregularity of no consequence. Also, it is clear that there was a discussion in the jury room concerning the high cost of malpractice insurance, as is pointedly revealed in the testimony of juror Hall, which in pertinent part, reads:
Q. Did you hear Mr. Newhard make any remarks concerning the fact that his brother-in-law was a doctor and his insurance rates were high because of things like this?
A. That I did.
Q. You did hear him say that?
A. Yes. * * *
A. His brother-in-law was a doctor in New York or Connecticut or somewhere.
Q. Yes.
A. And that he knew or he assumed that insurance was high.
Q. Because of cases like this?
A. Presumably, uh huh.
Q. You say "presumably." Did you say that he said "presumably" or are you presuming this? In other words, did he say that his brother-in-law was a doctor and that his malpractice insurance rates were high because of cases like this?
A. That's correct.
Q. This is what he said?
A. That's correct, as I remember.
The evidence is conflicting as to just when and what was said to the jurors by the court attendant to the effect that they should "hurry up." Juror Myers, in answer to the court's question, "Did any attendant, specifically a lady *36 attendant, at any time say to hurry up with your deliberations?", said, "Yes, uh huh, to be truthful with you, yes," and then qualified his answer with the statement, "Come on, it's getting late,' I believe that's what she said * * * or something like that." Mrs. Palilonis, another juror, expressed it this way: "She [the court attendant] didn't say `Hurry up,' Judge Smith, but we got the impression that she was irritated, you know, because we seemed to be taking too long. This was the impression that I got." Mrs. Palilonis added, "I didn't let that influence me and I don't think anybody else did."
It was Mrs. Palilonis who allegedly fainted, and, as to that happenstance, she explained, "I felt faint and I felt sick. I think it was the cigar smoke and not too much ventilation. * * * I felt sick but I wouldn't let that influence my thinking."
Of greater significance is the indication that Dr. Cotler did, indirectly during the trial, attempt to convey a message to Beck, the foreman of the jury. Toward the end of the trial, Beck's wife was hospitalized for three days and he visited her at the hospital. During his interrogation, Beck gave the following testimony:
Q. Did you tell Mrs. Nolan that you had a message?
A. I believe I told her that my sister-in-law had said that Dr. Cotler asked her if  if her husband had a brother. I never met Dr. Cotler. I believe this was what I  what you're indicating.
Q. Your sister-in-law?
A. Who still, evidently, has had contact with Dr. Cotler.
Q. You spoke with her during the trial?
A. I believe she called my wife on the telephone.
Q. Well, what was said to you?
A. My wife said that my sister-in-law had asked if I was her husband's brother. Dr. Cotler had indicated that there was a Beck on the jury and 
Q. Did you have a conversation with Mrs. Nolan one noontime in the jury room and say that you had received a message and did she say "I don't want to hear about it?"
A. No, I don't believe so.
* * * * * * * *

*37 MR. PERSKIE: Can we find out when during the trial this conversation took place with Cotler and his sister-in-law?
THE COURT: Well, was it during the trial? It must have been.
MR. BECK: It was, I would believe, during about the middle portion of the trial. Somewheres close to the middle portion. After the story had been in the paper, after it was common knowledge.
THE COURT: Did your wife give you any message from Dr. Cotler through your sister-in-law?
MR. BECK: No, sir.
Following the in camera proceedings, plaintiffs' counsel requested the opportunity to interrogate the foreman's wife, his sister-in-law and Dr. Cotler; the request was denied. The trial judge determined that "there was no misconduct on the part of any juror during the deliberation" and denied plaintiffs' motion for a new trial.
In light of the evidence to which we have alluded and its potential for prejudice, we are convinced that the trial court should have allowed further inquiry with respect to the alleged irregularities. See State v. Boiardo, 111 N.J. Super. 219, 235 (App. Div.), certif. den. 57 N.J. 130, cert. den. 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1970); State v. Sachs, 69 N.J. Super. 566, 588 (App. Div. 1961).
Having reached the conclusion that the matter should be retried, it is not necessary, for purposes of this opinion, to discuss the remaining arguments advanced on appeal. We observe, however, that while plaintiffs' experts testified that the defendant doctors were negligent in failing to visit or check the condition of their patient on Sunday, defendants produced no independent expert testimony with respect to their professional duty which "must be measured by some medical standard of care and treatment." Carbone v. Warburton, 11 N.J. 418, 428 (1953). Here, defendants merely indicated "that it was their practice not to make rounds on Sunday, but rather to rely upon the nurses and house physicians, unless they were dealing with an unusual problem or a critically ill patient." Death knows no holiday, neither does the sudden development of a gangrenous condition *38 following orthopedic surgery and the application of an extremital cast; the post-operative responsibility of the profession on a Sunday is no less than that on any other day during the week.
Finally, there is much in the record to suggest that the trial court might well reconsider a motion for a change of venue if plaintiffs renew such a motion.
The judgment of no cause for action is reversed and the matter is remanded for a retrial as to the individual defendants.