825 A.2d 559

PAUL OKULICZ, AS EXECUTOR OF THE ESTATE OF NANCY RAGAZZO OKULICZ, AND PAUL OKULICZ, INDIVIDUALLY, PLAINTIFF–APPELLANT, v. DOREEN E. DEGRAAFF, M.D., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 16, 2002—Decided June 25, 2003.

Before Judges STERN, COBURN and COLLESTER.

*Agnes I. Rymer* argued the cause for appellant (*Berkowitz, Lichtstein, Kuritsky, Giasullo & Gross,* attorneys; *Ms. Rymer,* on the brief).

*Stewart A. Cunningham* argued the cause for respondent (*Leyhane & Cunningham*, attorneys; *Mary Elizabeth Gazi*, on the brief).

The opinion of the court was delivered by

COLLESTER, J.A.D.

In this medical malpractice action plaintiff, Paul Okulicz, executor of the estate of his late wife, Nancy Okulicz, appeals from a judgment of no cause for action following a jury verdict in favor of defendant, Doreen DeGraaff, M.D., and from the denial of his motion for a new trial.

In 1995, thirty-six year old Nancy Okulicz was in the second trimester of her pregnancy with her second child. She received her pre-natal treatment from Dr. DeGraaff, who was a specialist in obstetrics and gynecology and part of a medical group with two other ob/gyn specialists. Because Nancy's advanced maternal age put her at risk for complications, Dr. DeGraaff referred her to Dr. Edward Wolf, a perinatologist with St. Barnabas Hospital, for an ultrasound examination. The examination disclosed no abnormalities to the fetus, but it showed a four and one-half by five centimeter mass on Nancy's left ovary. Dr. Wolf told both Nancy and Dr. DeGraaff about the ovarian mass and wrote a letter on the same day to Dr. DeGraaff, stating the results as follows:

> Ultrasound exam performed in our office revealed a single viable intrauterine pregnancy with a normal anatomic survey. Of note, there is a small 1 cm cyst on the right ovary and in the left adnexa was a 4.5 × 5 cm complex adnexal mass. It had shadows and calcifications consistent with a probable dermoid. I conveyed this information to you over the phone and you elected to follow the patient expectantly. I discussed with the patient the risks/benefits and alternatives of expectant management vs. surgical exploration at this gestational age. The patient elected to proceed with expectant management. A follow-up exam was recommended in 4 to 6 weeks to evaluate the size of the mass.

Dr. DeGraaff said that Dr. Wolf told her the mass had the characteristics of a benign cystic teration or dermoid cyst. He also related to Dr. DeGraaff that he discussed options with Nancy, including surgery with a slight risk to the pregnancy and fetus. He said Nancy opted for "expectant management" during the

pregnancy, which involved continued monitoring of the ovarian mass and ultrasound examinations on a regular basis until delivery.

Dr. DeGraaff telephoned Nancy the same day. While she had no clear recollection of the conversation, Dr. DeGraaff said that she would have told Nancy that although the mass appeared benign, the only way to verify was by surgical removal and biopsy. She said she would have also told her it was early enough in the pregnancy for her to wait six weeks and be re-examined for any changes in the mass before electing surgery. Dr. DeGraaff testified that she would have told Nancy that surgery would be of some risk to the fetus but could not recall if she provided her with a percentage of the risk. She conceded that the second trimester of pregnancy was the safest time for surgery with only a five percent chance of fetal loss and fifteen to twenty percent chance of maternal complications. Dr. DeGraaff said she pursued expectant management with Nancy's pregnancy because of the perceived low risk based on the information she received from Dr. Wolf that the mass appeared to be a teratoma, although she recognized that some malignant cysts could appear to be teratomas.

Dr. DeGraaff also admitted she did not take a history from Nancy about cancer in her family, which would have revealed that Nancy's sister had breast cancer, and her father had colon cancer. She conceded that such information could alert a physician to an increased risk of cancer for her patient.

Paul Okulicz testified that he and his wife met with Dr. Wolf in his office after the ultrasound examination. Dr. Wolf told them the mass appeared to be a dermoid, which was "nothing serious," and he recommended only monthly examinations during pregnancy. Paul said Dr. Wolf did not discuss surgery to remove the mass and never mentioned cancer. Later that day Paul was at home with Nancy when Dr. DeGraaff called to discuss the finding of the ovarian mass. He said that during the conversation Nancy sounded "very happy, very nonchalant about the conversation. And it was nothing that would have run up a flag." Nancy told

him Dr. DeGraaff wanted to know how the sonogram went and whether Nancy was comfortable. During the conversation of three or four minutes, Dr. DeGraaff did not mention the possibility of cancer or that the mass could be removed and biopsied at that time with only slight danger to the fetus. Paul claimed that if Dr. DeGraaff told them of a greater risk for cancer by delaying surgery until after the delivery, "I would have looked to my wife and said to her, 'we've got a little girl, we love Claudia so much, she needs a mother. Whatever they tell us to do, let's follow the procedures.'" He added that if he were ever informed of a continuous risk posed by the mass after delivery, he and his wife would certainly have chosen surgery.

Nancy remained under Dr. DeGraaff's care throughout her prenatal period. She was examined on May 8, July 24 and August 31, 1995. Dr. DeGraaff did not recall speaking to Nancy about the mass during these visits, and her office records did not reflect any discussion of the issue. She also did not remember telling Nancy that the mass must be removed and biopsied after delivery. She admitted that an ovarian mass was most easily removed immediately after caesarian delivery while the ovaries are exposed. During this time Nancy saw Dr. Wolf for follow-up ultrasound examinations, and no noticeable changes were observed.

On September 3, 1995, three days after her last examination by Dr. DeGraaff, Nancy Okulicz gave birth to a healthy baby boy by vaginal delivery. The delivery was performed by Dr. Marshall Pollack, a member of Dr. DeGraaff's group who was on call at the time. Nancy spent three days in the hospital following the birth. No one discussed the ovarian mass with her during that time.

Dr. DeGraaff testified she could not recall any conversations with Dr. Pollack or any of her colleagues about removal of the ovarian mass after delivery, and her records did not indicate any such conversations. She said that if there had been a notation in the hospital record about expectant management of the mass, it would have alerted the physician to examine the mass, since

removal "is part of what's considered expectant management." She admitted that she did not place such a note on the chart.

It was normal procedure within Dr. DeGraaff's group for the doctor who performed the delivery to see the patient for the postpartum examination. Dr. Pollack conducted the examination six weeks later, and Paul testified that he and Nancy were told the mass had not grown and "everything was fine." He said neither Dr. Pollack nor Dr. DeGraaff suggested Nancy undergo surgery for removal and further examination of the ovarian mass.

Paul testified that after the postpartum examination, Nancy was "tired and heavier and unable to regain her active life style." A few weeks later, Nancy called Dr. DeGraaff to say she was feeling tired and weak, and she was told that her age at the time of delivery was the cause of her not "bouncing back." However, in February 1996, Nancy called Dr. DeGraaff about some strange symptoms she was experiencing—a rash, night sweats, and fevers. Dr. DeGraaff referred Nancy for a colonoscopy and a CAT scan. The CAT scan revealed ovarian cancer. Paul and Nancy went immediately to Dr. DeGraaff's office. Paul said that when they arrived, Dr. DeGraaff was "hysterical" and said it was "unbelievable" that Nancy had ovarian cancer. She referred them to an oncologist at St. Barnabas Hospital for exploratory surgery. The surgery confirmed ovarian cancer and further revealed that the cancer had metastasized beyond Nancy's ovaries and was throughout her pelvis and abdomen. The prognosis was dire. Nancy underwent rounds of chemotherapy and other treatment, but she died on April 8, 1997, of progressive metastatic ovarian cancer. She was thirty-eight years old.

After his wife's death, plaintiff filed suit alleging malpractice by Drs. DeGraaff, Pollack and Wolf and St. Barnabas Hospital. As trial was to begin, there was a settlement with all defendants except Dr. DeGraaff.

Plaintiff produced two expert witnesses in obstetrics and gynecology, Dr. Stephen Leviss and Dr. Nicholas Kadar. Dr. Leviss' testimony described ovarian cancer as a malignant tumor which

arises within the ovary or on the outside of the ovary and then grows within the ovary. When the tumor is confined to the ovary, it is termed Stage I ovarian cancer. If it metastasizes to the other ovary or adjacent structures including the womb and perineum, it has reached Stage II ovarian cancer. In Stage III ovarian cancer, the cancer has metastasized throughout the abdomen. In Stage IV it has spread beyond the abdomen into other structures of the body.

Dr. Leviss testified that both Dr. Pollack and Dr. DeGraaff deviated from the proper standard of medical care in the treatment of Nancy Okulicz. He said Dr. DeGraaff deviated by failing to tell Nancy of the continued risk presented by the ovarian mass and in failing to follow up with Dr. Pollack to insure that the mass was removed following delivery. He opined that these deviations resulted in an increase of the risk that the latent cancer would progress to an inoperable Stage IV carcinoma. He said that had the mass been removed prior to or just after delivery, its cancerous nature would have been discovered, and there would be a good prognosis.

> [W]hen the mass comes out and is sent to pathology, it is either a dermoid, which this doctor suspected, which ... in my opinion, it was not; or it is cyst adenoma, which is a precancerous condition which would be totally cured by removing the ovary in virtually 100% of the time. Or it is a cyst adenocarcinoma, which is ... in a Stage I, which involves the ovary, in which case removal of that ovary will effect cure in at least 80 percent of the time. And at that point in time, if the patient is willing to undergo removal of both ovaries and a total hysterectomy, and her lymph nodes are clean and the omentum is clean, then her chance of survival in a Stage I cancer would approach 90 percent.

Dr. Leviss' conclusion was that, within a reasonable degree of medical probability, Nancy would be alive and free of disease if Drs. DeGraaff and Pollack had treated her properly during the postpartum period by directing the removal of the cervical tumor. Dr. Kadar concurred with Dr. Leviss, stating his opinion that if the mass been removed after delivery, there was a reasonable degree of probability that Nancy would have recovered since she was not then in the final stage of cancer.

Dr. DeGraaff testified on her own behalf. She also produced two expert witnesses, Dr. Roger T. Kierce and Dr. Stewart Weiner, who testified that defendant's treatment of Nancy did not constitute a deviation from standard medical practice. Dr. Kierce said that when the ovarian mass was first observed in March 1995, it presented a one percent risk of development into ovarian cancer. He stated Dr. DeGraaff could properly rely upon the opinion of Dr. Wolf that the mass did not present a cancerous risk. Similarly, Dr. Weiner testified that Dr. DeGraaff's treatment of Nancy was proper after discovery of the ovarian mass.

However, neither defense expert testified that the failure of Dr. DeGraaff to follow up on the need to surgically remove the mass after delivery of the child did not constitute a deviation. There was no testimony that the risk of harm to Nancy did not increase as a result of the decision to follow a course of expectant management during pregnancy and the failure to remove the ovarian mass after delivery. Therefore, Dr. DeGraaff produced no expert medical testimony to contradict the statements of plaintiff's experts that the risk of a cancer metastasizing increased as time progressed. Rather the arguments were as follows: (1) Dr. DeGraaff justifiably relied upon the statements of Dr. Wolf that the mass was benign and, in any event, Dr. Wolf had advised Nancy of treatment options; (2) even assuming that Nancy had not been fully advised of all risks, there was no proof that she would have chosen surgery while pregnant in light of the risk of harm to the fetus; and (3) it was Dr. Pollack, not Dr. DeGraaff, who had the duty to recommend surgical removal of the mass since he delivered the child and saw Nancy for the postpartum examination.

The jury returned a verdict in favor of Dr. DeGraaff by responding to the first two questions on the verdict form as follows:

1. Did the defendant, Dr. DeGraaff, deviate from acceptable standards of medical practice in the treatment of the plaintiff, Nancy Okulicz, or in obtaining an informed consent to the treatment from the plaintiff, Nancy Okulicz?

Yes x No___ 8-0___ 7-1___

If yes, continue with question # 2. If no, terminate your deliberation.

2. Did Dr. DeGraaff's deviation increase the risk of harm imposed by the plaintiff's pre-existing condition?

Yes___ No _x_ 8–0___ 7–1___

If yes, proceed to question # 3. If no, terminate your deliberations.

As a result of their answer to Question 2, the jury did not address the following questions on the verdict form:

3. Was the increased risk of harm a substantial factor (a proximate cause) in producing the ultimate injury-death of the plaintiff, Nancy Okulicz?

Yes___ No___ 8–0___ 7–1___

If yes, proceed to question # 4. If no, terminate your deliberations.

4. Has the defendant, Dr. DeGraaff, proven that some portion of Nancy Okulicz's ultimate injury would have occurred even if the defendant's treatment was proper?

.Yes___ No___ 8–0___ 7–1___

. . . .

6. Has the defendant, Dr. DeGraaff, proven that the settling defendants, Dr. Pollack and/or Dr. Wolf, were negligent and their negligence proximately caused or contributed to the ultimate injury-death of Nancy Okulicz?

Yes___ No___ 8–0___ 7–1___

In denying plaintiff's subsequent motion for a new trial, the judge reconciled the jury finding of a deviation from acceptable medical standard by Dr. DeGraaff with the finding that the deviation did not increase the risk of harm imposed by decedent's pre-existing condition.

The evidence presented to the jury in this case, while this was an unusual situation, the evidence presented to the jury could very well have convinced the jury that while there may have been some deviation by Dr. DeGraaff in not fully explaining to the plaintiff the initial mass that was found, and that Dr. DeGraaff's reliance on Dr. Wolf's ... explanation, may have been a deviation. That it was her requirement to fully explain it at that point.

But that failure to explain really had no effect on the ultimate outcome of Mrs. Okulicz's condition. The jury certainly could have found that the failure to take proper action was Dr. DeGraaff's partner, Dr. Pollack, was really the real problem here and not Dr. DeGraaff.

Whether or not this Court agrees with the jury verdict or disagrees with the jury verdict, really is totally irrelevant. There was substantial evidence presented to the jury about what occurred in this case. There was evidence, albeit disputed, that Dr. DeGraaff was advised by the radiologist that he fully informed Mrs. Okulicz about her condition. Mr. Okulicz testified that contrary to that, that he merely indicated that he had determined what type of a mass it was and it would

be monitored by ultrasounds during the pregnancy, and ultimately should probably be removed at the conclusion of pregnancy.

Because the delivery took place over a holiday weekend when Dr. DeGraaff partner was on call, the policy, as described in the testimony, was that whoever delivered the baby did the postpartum exam. Certainly, the jury could have clearly concluded based on all of the evidence that this problem of the plaintiff was not the result of whatever deviation they found Dr. DeGraaff did, but of other initially named defendants, people who were testified to extensively throughout the trial.

Plaintiff argues that the trial judge erred in denying his post-trial motion because the jury determination was against the weight of the evidence and constituted a miscarriage of justice. He also contends that the jury responses to the first two questions on the verdict form were inconsistent and indicated jury confusion.

Our scope of review from the denial of a motion for a new trial is such that a jury verdict will not be overturned unless there is a clear showing of a miscarriage of justice. _R._ 2:10–1. In considering that standard we must make an independent assessment of the trial record while giving deference to the trial judge regarding the intangible aspects of the case including witness credibility and "the feel of the case." _Schaefer v. Cedar Fair L.P._, 348 _N.J.Super._ 223, 240, 791 _A._2d 1056 (App.Div.2002); Pressler, _Rules Governing the Courts of the State of New Jersey_, 625 (2003).

Plaintiff argues that having found that Dr. DeGraaff deviated from acceptable standards of medical practice in her treatment of Nancy, the jury could not reasonably then find on the proofs presented that the deviation did not increase the risk of harm. He points out that the only testimony on the issue came from his experts, both of whom opined that Nancy's ovarian cancer was probably in Stage I, the early stage, when the sonogram was performed by Dr. Wolf and that the risk of the cancer metastasizing increased as time progressed. There was no testimony by defense witnesses that the risk of harm did not increase as a result of the decision to follow a course of expectant management rather than removal of the mass, and there was also no contrary evidence to counter plaintiff's proofs that failure to remove the mass after delivery further increased the risk.

New Jersey has adopted the principle set forth in *Restatement (Second) of Torts*, § 323(a) (1965), which permits recovery for negligence when the plaintiff suffered from a pre-existing condition, provided that the defendant's negligence increased the risk of the pre-existing condition and the increased risk was a substantial factor in producing the plaintiff's condition. *Reynolds v. Gonzalez*, 172 *N.J.* 266, 282–83, 798 *A.*2d 67 (2002); *Scafidi v. Seiler*, 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990); *Evers v. Dollinger*, 95 *N.J.* 399, 417, 471 *A.*2d 405 (1984); *Scott v. Salem County Memorial Hospital*, 116 *N.J.Super.* 29, 33–34, 280 *A.*2d 843 (App.Div.1971).

In the instance of a pre-existing cancer, it is commonly known that delay in treatment almost invariably leads to an increased risk of serious prognosis. *Evers, supra*, 95 *N.J.* at 411, 471 *A.*2d 405.

In *Evers* the plaintiff's breast cancer was not diagnosed for about six months after the defendant physician had first indicated that she should not be concerned about a tiny lump. In fact, the cancerous tumor metastasized, and plaintiff underwent a right extended mastectomy. The trial judge refused to consider the reports of plaintiff's experts on the increased risk from the delay in diagnosis because they could not quantify the increased risk of recurrence of cancer. On appeal from summary judgment for defendant, the Supreme Court reversed, citing the uncontradicted evidence that during the time of delay in diagnosis the malignant tumor had increased in size and developed beyond the original site.

> Here, the malignant tumor grew significantly, not imperceptibly, during a seven months delay attributable to defendant's malpractice. Plaintiff clearly established that defendant's failure to diagnose the tumor prevented her from undergoing a mastectomy to excise the tumor at the earliest opportunity in 1977. As a proximate result of this malpractice, the tumor remained, grew, and spread in her body. An increase in the size of a malignant tumor, by definition, results in the spread of cancer cells into once healthy tissue, and therefore is an injury in and of itself.
>
> The concession on the part of plaintiff that a mastectomy would have been necessitated even if the malignancy had been promptly diagnosed does not derogate from the fact that the malignancy was not promptly diagnosed. As a proximate result of that dereliction by defendant, the tumor not only remained in

her body, it grew in size. Plaintiff was unquestionably more seriously diseased as a result of the growth of the malignancy. This constituted actionable harm proximately caused by defendant's alleged malpractice according to a standard of reasonable medical probability. It was error on the part of the trial court to fail to recognize this form of injury as a compensable element of damages.

The facts of this case are similar to *Evers*. The jury adjudged Dr. DeGraaff negligent. Whether the negligence finding related to a failure to inform Nancy of the fact that the mass could be cancerous and that delay could pose greater danger, or whether it was directed to Dr. DeGraaff's failure to follow up on her patient to insure the mass was removed after delivery, the expert testimony indicated that the risk of the growth of the tumor and possibility of metasticity increased by defendant's negligent conduct. Therefore, we find that the jury verdict was factually inconsistent and indicated jury confusion. *See, Kimmel v. Dayrit*, 301 *N.J.Super.* 334, 353, 693 *A.*2d 1287 (App.Div.1997), *aff'd as modified*, 154 *N.J.* 337, 712 *A.*2d 1129 (1998). Accordingly, we vacate the judgment for defendant, reverse the order denying a new trial, and remand for a new trial.

Reversed and remanded.