972 A.2d 436 (2009)
407 N.J. Super. 576
Anthony GONZALEZ, Jr., Plaintiff-Appellant,
v.
Seth SILVER, M.D. and South Jersey Center for Orthopedics and Sports Medicine, Defendants-Respondents.
DOCKET NO. A-2264-07T1.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 2009.
Decided June 9, 2009.
*439 Jeffrey M. Keiser, Haddonfield, argued the cause for appellant.
Timothy P. O'Brien, argued the cause for respondents Seth Silver and South Jersey Center for Orthopedics and Sports Medicine (Crammer Bishop Marczyk & O'Brien, P.C., attorneys; Mr. O'Brien, of counsel; Mary Ann C. O'Brien, on the brief).
Abbott S. Brown, West Orange, argued the cause for amicus curiae Association of Trial Lawyers of America, New Jersey (Bendit Weinstock, P.A., attorneys, West Orange; Alan Y. Medvin, Newark and Mr. Brown, on the brief).
Before Judges PARRILLO, LIHOTZ and MESSANO.
The opinion of the court was delivered by
PARRILLO, J.A.D.
In this medical malpractice action, plaintiff Anthony Gonzales, Jr., appeals from a judgment of no cause of action following a jury verdict in favor of defendants Seth Silver, M.D. (defendant) and South Jersey Center for Orthopedics & Sports Medicine, and from the denial of his motion for a new trial. For the following reasons, we reverse.
On April 16, 2003, plaintiff injured his left arm when, while working as a car wash attendant, he was either standing or sitting on a vehicle and fell as it started to move. He was examined at the local emergency room by Dr. Joseph Bernardini, who took x-rays of the hand, arm and elbow, and diagnosed plaintiff's injury as a "Galeazzi" fracture of the forearm with a dislocated wrist and swelling of the left elbow, with no evidence of a dislocated elbow or major soft tissue injury. Plaintiff was seen later that same day by defendant, a Board certified orthopedic surgeon, who reviewed plaintiff's x-rays, chart, and the findings of Dr. Bernardini. After obtaining an independent history from plaintiff, defendant performed surgery to correct the fractured dislocation of the distal radial ulnar joint in plaintiff's wrist. Throughout the procedure, defendant utilized fluoroscopy, a radiolucent "live time x-ray" to "help guide what we're doing," which disclosed nothing abnormal about plaintiff's elbow.[1] Admittedly, however, no radiographic copies were taken of plaintiff's elbow at this time.
After the surgical procedure, defendant verified the stability in plaintiff's arm by holding his elbow, and while continuing to hold plaintiff's elbow, put a cast on plaintiff's arm. Defendant observed no abnormality in the elbow and did not believe one existed because
in my experience with elbow dislocations, you cannot move and flex them with free, easy glide. Furthermore, the pronation and supination would also be inhibited and that would be difficult to do.
You would palpate or feel an abnormality and it's been pointed out, [plaintiff's] anatomy is easy to see. He's a slender guy and this is such a gross deformity that on observation or feeling, it would be apparently obvious to anybody.
*440 In any event, after recovering for a few days under defendant's care, plaintiff was discharged from the hospital. Twelve days after surgery, on April 28, 2003, plaintiff saw defendant for the first post-operative visit, during which defendant removed plaintiff's cast and reapplied a new cast. According to plaintiff, he complained to defendant about elbow discomfort but no x-rays were taken of plaintiff's elbow. Defendant, on the other hand, denied any such complaints, saying that he would have taken elbow x-rays had plaintiff been experiencing elbow pain.
Plaintiff returned to defendant for a second post-operative visit on May 12, 2003. According to defendant, plaintiff was interviewed, evaluated, and an x-ray was taken of the forearm and wrist, but not the elbow, and plaintiff's cast was not changed. Defendant denied that plaintiff ever complained about elbow pain. Plaintiff's account differed, insisting that his cast was changed, and that he did in fact inform defendant of recurring pain and swelling in his elbow, which defendant told him was normal.
Plaintiff returned for a third visit on May 30, 2003, at which time both agree that plaintiff complained about general discomfort in his elbow. Prior to removing the cast, defendant informed plaintiff that it was likely due to cast stiffness in the elbow joint. When the cast was removed, however, defendant observed an abnormality in the elbow that was not present during the first post-operative visit. Defendant then took x-rays of the elbow and diagnosed an acute dislocated elbow. He attempted a reduction maneuver to pop the elbow back into position, but was unsuccessful and recommended emergency surgical reduction. Subsequently, defendant performed an operation to correct the elbow dislocation, and found hematoma, scar tissue and cicatrix. Based on finding cicatrix and hematoma, which according to defendant are present in the early stages of scarring, defendant determined that the elbow dislocated within the last two weeks.
Plaintiff's expert, Dr. David Smith, a retired orthopedic surgeon, disagreed with defendant's assessment and opined that plaintiff's elbow dislocated during surgery because "you cannot spontaneously dislocate your elbow when it's locked up in a 90-degree cast.... [B]because the large triceps muscle hooks onto your olecranon like a tight rubber band." In other words, an elbow could not dislocate within a cast. In Dr. Smith's opinion, the negligence was not in dislocating the elbow, which is a recognized risk of the surgical procedure, but rather in failing to take an x-ray to ensure that surgical manipulation of the wrist did not dislocate the elbow. According to Dr. Smith, it was a deviation from accepted standards of medical practice for defendant to have failed to "examine the elbow at the end of the [April 16, 2003] procedure [on plaintiff's wrist] and to take an x-ray to make sure that the elbow is still in good position." Had defendant taken an x-ray at that time, he could have discovered plaintiff's dislocated elbow and a simple reduction maneuver would have popped it back into place, obviating the need for a second surgery, after which plaintiff suffered persistent pain. Instead, waiting until the third post-operative visit to make the diagnosis increased the risk that plaintiff would suffer the permanent injuries he experiences to date, namely diminished range of motion, arthritis, and build-up within the joint.
Defendant disagreed that surgical manipulation of plaintiff's wrist caused plaintiff's elbow to dislocate. According to defendant,
I had a force pulling distally on the hand and a force pulling proximally on the upper arm, meaning downwardly and *441 one upwardly. Which is the exact opposite of the direction of the way this is displaced.
Moreover, after surgery, defendant viewed and felt plaintiff's elbow while wrapping plaintiff's arm and observed no abnormality.
Defendant's expert, Dr. A. Lee Osterman, an orthopedic surgeon, agreed with defendant's evaluation. He opined that when plaintiff fell, he suffered initial injury to his elbow ligaments and over time they became attenuated, resulting in dislocation within the cast. Such an injury is only evident in retrospect because it rarely happens and is impossible to detect until the elbow actually dislocates. Consequently, plaintiff would not have benefited from any type of post-operative examination, including an x-ray of the elbow, which would not reveal soft-tissue injuries.
According to Dr. Osterman, the elbow dislocation did not occur during surgery because surgical manipulation of the kind performed by defendant would have produced an anterior dislocation, while plaintiff suffered from a posterior dislocation, and also defendant would not have been able to bend and flex plaintiff's arm to 90 degrees after the surgery in order to place the cast, particularly in light of the posterior dislocation plaintiff suffered. Dr. Osterman disagreed with Dr. Smith's conclusion that elbow dislocation could not occur while the arm was casted, explaining that a cast would not have held the elbow absolutely still because active muscles directed force on the bone from the posterior direction. Rather, in Osterman's view, the organized hematoma found in plaintiff's elbow indicated that dislocation more likely occurred during the two to three weeks prior to plaintiff's third post-operative visit.
Consequently, Dr. Osterman concluded that the standard of care neither required defendant to capture an x-ray image of the elbow joint at the end of the surgery nor capture one at the first post-operative visit. It was enough that defendant used fluoroscope during the surgery to confirm that plaintiff's elbow was congruent, which is often done. Contrary to Dr. Smith's opinion, there was no reason to preserve hard copy photos of plaintiff's elbow unless an abnormality had been detected and, in any event, plaintiff's soft-tissue injury would not have been discovered using x-ray.
Plaintiff filed a medical malpractice complaint against defendant and his practice, alleging that defendant's failure to test for, and diagnose, the dislocated elbow at an earlier date increased the risk of harm, which in turn was a substantial factor in causing his permanent injury. At the close of evidence, the jury returned a verdict finding that defendant did in fact deviate from the standard of professional care but that such deviation was not the proximate cause of his injuries. Accordingly, the court entered an order for judgment of no cause for action in favor of defendant, and subsequently denied plaintiff's motion for a new trial.
On appeal, plaintiff claims the court erred in giving the traditional "but for" proximate cause charge; in failing to ask open-ended questions during jury selection; and in admitting "car surfing" testimony. We agree with the first and reverse.

(I)
Alleging that defendant's failure to diagnose the dislocated elbow at an earlier date increased the risk of permanent injury, plaintiff moved in limine, requesting a "failure to perform a test" charge, pursuant to Gardner v. Pawliw, 150 N.J. 359, 375, 696 A.2d 599 (1997), and an "increased *442 risk substantial factor" charge pursuant to Scafidi v. Seiler, 119 N.J. 93, 108-09, 574 A.2d 398 (1990). He also submitted model jury charges to this effect. The judge reserved decision. At the close of evidence and at a charge conference, the court declined both requests, opting instead to instruct the jury on the standard "but for" proximate causation charge, believing that the negligence alleged was the dislocation of plaintiff's elbow during surgery. The instruction actually given, however, is somewhat of a hybrid, and reads as follows:
[Y]ou must first find that the resulting incident, or injuries, to the plaintiff, Mr. Gonzalez, would not have occurred but for the negligent conduct of Dr. Seth Silver.
Second, you must find that Dr. Silver's negligent conduct was a substantial factor in bringing about the resulting injury and losses to the plaintiff. By substantial, I mean that the cause is not remote, trivial, or inconsequential.
If you find that Dr. Silver's negligence was a cause of the incident, and that such negligence was a substantial factor in bringing about the resulting injury or losses, then you should find ... that Dr. Silver was a proximate cause of the plaintiff, Mr. Gonzalez's injury.
[(emphasis added).]
Plaintiff now claims error in the failure to give the requested instructions, maintaining that the negligence asserted was not in dislocating plaintiff's elbow during surgery, but rather in failing to x-ray and diagnose a condition preexistent at the time of defendant's deviation. However, because plaintiff never actually objected to the jury charge as ultimately formulated, the alleged error, to be reversible, must amount to plain error. R. 1:7-2; R. 2:10-2. In this regard, an incorrect charge is reversible error if the jury could have come to a different result had it been correctly instructed. Velazquez v. Portadin, 163 N.J. 677, 688, 751 A.2d 102 (2000).
To establish a prima facie case of negligence in a medical-malpractice action, a plaintiff must present expert testimony establishing (1) the applicable standard of care, (2) a deviation from that standard of care, and (3) that the deviation proximately caused the injury. Gardner, supra, 150 N.J. at 375, 696 A.2d 599. In such actions, our courts have lessened the traditional burden of proof for establishing proximate cause where a plaintiff suffers from a preexistent condition. Ibid.; Scafidi, supra, 119 N.J. at 108-09, 574 A.2d 398; Evers v. Dollinger, 95 N.J. 399, 417, 471 A.2d 405 (1984). "A plaintiff suffering from a preexistent condition must prove that, as a result of a defendant's negligence, she experienced an increased risk of harm from that condition, and that the increased risk of harm was a substantial factor in causing the injury ultimately sustained." Gardner, supra, 150 N.J. at 375, 696 A.2d 599; Anderson v. Picciotti, 144 N.J. 195, 210, 676 A.2d 127 (1996).
In other words, because, in such cases, some harm would have inevitably been caused by an independent source and, consequently, the plaintiff could not show that "but for" the actor's conduct the damage would not have occurred, our courts have relieved the plaintiff of proving the more stringent "but for all-or-nothing" causation in favor of the more relaxed "substantial factor" standard. Anderson, supra, 144 N.J. at 208, 676 A.2d 127. See e.g., Verdicchio v. Ricca, 179 N.J. 1, 31-33, 843 A.2d 1042 (2004) (doctor who failed to perform examination that would have led to earlier discovery of cancer liable when jury concluded that the increased risk to which doctor exposed patient was a substantial factor in bringing about harm); Evers, supra, 95 N.J. at 406, 471 A.2d 405 (plaintiff *443 could prevail by showing that the delay in treatment of breast cancer after diagnosis was a substantial factor in bringing about a recurrence of disease and subsequent worsening of condition); Hake v. Manchester Twp., 98 N.J. 302, 311, 486 A.2d 836 (1985) (to establish causation, plaintiffs could show that defendant police officers' negligent failure to render prompt emergency care to their son when police discovered him unconscious in a jail cell negated a substantial possibility that prompt rescue efforts would have been successful, thereby constituting a substantial factor in causing defendant's death).
The stricter "but for" standard presupposes that a "defendant's negligence began a chain of events leading to the plaintiff's injury," Scafidi, supra, 119 N.J. at 102, 574 A.2d 398, and requires proof that the negligence "was a probable cause of the resultant injury." Id. at 107, 574 A.2d 398 (emphasis in original). In contrast, the substantial factor test requires only that the physician's deviation, in the context of the preexistent condition, "was sufficiently significant in relation to the eventual harm [as] to satisfy the requirement of proximate cause." Id. at 109, 574 A.2d 398. The two-part substantial factor analysis asks "`whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm.'" Verdicchio, supra, 179 N.J. at 24, 843 A.2d 1042 (quoting Gardner, supra, 150 N.J. at 376, 696 A.2d 599). Thus, where a physician-defendant's negligence combines with a patient-plaintiff's preexistent condition to cause harm, it is reversible error to instruct the jury on the "but for" proximate cause standard either alone or in conjunction with the substantial factor test. See Battenfeld v. Gregory, 247 N.J.Super. 538, 549, 589 A.2d 1059 (App. Div.1991).
Defendant argues, however, and the trial judge found, that this is not a case wherein the plaintiff came to the defendant-physician with a pre-existing condition and the defendant's deviation resulted in a reduced chance of cure. Rather, he contends, this is a case where it is alleged that the defendant was the cause-in-fact of the ultimate harmthe elbow dislocation and therefore the standard proximate cause charge was properly given since it presupposes that the defendant's negligence began a chain of events leading to the plaintiff's injury.
This argument misses the point. Plaintiff never claimed defendant acted negligently in supposedly causing plaintiff's elbow to dislocate by manipulation and utilization of traction during the surgery to correct the fracture dislocation of his wrist. On the contrary, the deviation alleged was that defendant did not timely diagnose the dislocation because he failed to perform the recognized test either through post-surgical x-ray or x-rays at the follow-up visits, which would have increased the probability of early diagnosis and treatment of the underlying condition. The causation alleged was that failure to perform the test increased the risk of harm associated with the delayed recognition of the dislocation; that had the dislocation been timely recognized, plaintiff would have had an increased chance of recovery and full function of his elbow; and that the delay in treatment was a substantial factor in the ultimate outcome, namely plaintiff's permanent disability.
Defendant offers no support for his general claim that a Scafidi-type charge does not apply to situations where the condition that was not timely diagnosed was alleged to be caused by the defendant-physician *444 himself. Actually, case law is to the contrary. See Scott v. Salem County Memorial Hosp., 116 N.J.Super. 29, 33-34, 280 A.2d 843 (App.Div.1971). In Scott, the plaintiff's treating orthopedic physician applied a plaster cast to plaintiff's right leg after diagnosing fractured tibia and fibula. Id. at 31, 280 A.2d 843. Plaintiff remained in the hospital overnight and on the following day, Sunday, complained that the cast was too tight and causing her pain, a condition which was not relieved by the hospital staff. Id. at 32, 280 A.2d 843. By Monday morning, the plaintiff had lost sensation in her toes, and when her treating physician removed the cast, he discovered that the plaintiff's leg had developed gangrene. Ibid. Subsequently, the plaintiff's leg was amputated below the knee. Ibid. Plaintiff sued her treating physician and his partner for medical malpractice, and at trial, alleged negligence not in plastering the cast too tightly, but in failing to examine her condition to confirm that the cast had been comfortably applied and was not developing edema-caused pressure. Ibid. In defense, the defendant argued that "plaintiff's problem was occasioned by an injury to the nerves or vascular system" when she broke her leg. Id. at 33, 280 A.2d 843. Having been instructed on "but for" causation only, the jury returned a verdict of no cause in favor of the defendants. Id. at 31, 38, 280 A.2d 843. We reversed, holding that the jury should have been instructed on "concurrent negligence" requiring "a substantial factor" theory of proximate causation. Id. at 33-34, 280 A.2d 843.
Here, as in Scott, plaintiff claimed that defendant's non-negligent conduct created a condition that defendant later failed to timely test for, diagnose and treat, thereby increasing the risk of harm from the established elbow dislocation, and warranting the more favorable proximate cause charge. The confusion that led to the opposite result below arose, no doubt, from the fact that the so-called pre-existing condition and defendant's alleged deviation attached nearly simultaneously, rendering them virtually indistinguishable. Granted, in the usual Scafidi-type case, the existence or identity of a pre-existing disease or condition is readily apparent. But the fact that such a condition has not been long associated with a plaintiff prior to the defendant's alleged deviation neither automatically precludes a Scafidi charge on the one hand, nor mandates a straight proximate cause instruction on the other. See Anderson, supra, 144 N.J. at 211, 676 A.2d 127.
Indeed, this is not a case in which the alleged deviation, namely the failure to perform an x-ray, is the sole cause of the ultimate harm alleged to have been sustained. On the contrary, there is sufficient proof of concurrent causesthat is, plaintiff's alleged deviation acting in conjunction with the underlying ligament damage and subsequent elbow dislocation claimed to have happened during surgeryto render the "but for" instruction inapplicable. See id. at 206, 676 A.2d 127; Scafidi, supra, 119 N.J. at 108-09, 574 A.2d 398. Here, the evidence permitted the jury to find that defendant's failure to test and diagnose was a deviation from the professional standard of care and that such deviation increased plaintiff's risk of harm from the established, underlying condition. Because the proofs admit of concurrent causes working in conjunction to produce the harm, the court should have used the substantial factor test, which directs the jury to determine whether the deviation, in the context of the preexistent condition, "`was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.'" Anderson, supra, 144 N.J. at 207, 676 A.2d 127 (quoting Scafidi, supra, 119 N.J. at 109, 574 A.2d *445 398).[2] In our view, the failure to give a proper causation charge constituted plain error.[3]
Having succeeded on his claim of reversible error, plaintiff next argues that the new trial should be limited to the issue of proximate cause which, he claims, was separate and distinct from the jury's liability finding. We disagree.
"[T]he general rule [is] that issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues." Ahn v. Kim, 145 N.J. 423, 434, 678 A.2d 1073 (1996). In Tindal v. Smith, 299 N.J.Super. 123, 138, 690 A.2d 674 (App.Div.), certif. denied, 150 N.J. 28, 695 A.2d 670 (1997), we held that "erroneous instructions on proximate cause [did] not require a new trial [on liability] because the verdict and judgment were premised on a finding of no negligence and, based on the evidence, the two issues were entirely distinct and separate." There, the "judge charged on negligence separately from proximate cause and repeatedly explained that the jurors would not consider the latter unless they found `that either or both of the defendants in this case have departed from the accepted medical standard' or `were negligent.'" Ibid.
By contrast, in Conklin v. Hannoch Weisman, 145 N.J. 395, 411, 678 A.2d 1060 (1996), the Supreme Court required a retrial of both negligence and proximate cause in a legal malpractice case where the jury found the defendants negligent and there was an error in the instructions as to proximate cause. There, the Court could not conclude "that the jury's finding of negligence was entirely distinct and separable from the issue of proximate cause," because the Court had "no way of knowing precisely what conduct" constituted the basis for the jury's finding of negligence. Ibid. Similarly, in Ahn, the Court required a retrial of both negligence and proximate cause in a medical malpractice case because the jury's finding of negligence did not indicate whether it related to the staff's nursing or security duties, and thus, "[w]ithout knowing the basis for the *446 finding, a second jury [would be unable to] determine whether the deviation caused the patient's death." Ahn, supra, 145 N.J. at 435, 678 A.2d 1073.
Here, the jury did not make specific factual findings, but returned a general verdict answering in the affirmative that defendant deviated from the standard of care. Although we presume this finding was based on defendant's failure to take an x-ray sometime after surgery because that was the only deviation from accepted medical practice established by plaintiff's proofs, nothing in the jury's verdict indicates at what point defendant deviated from the standard of care. Indeed, plaintiff's expert testified that defendant deviated twice from the standard of care: once directly after surgery and again at the first post-operative visit. Because of the time-sensitive nature of plaintiff's ultimate injury, a second jury would be unable to determine whether the deviation caused plaintiff's ultimate injury without knowing the precise basis for the negligence finding.

(II)
Given this disposition, we need not resolve the remaining issues raised by plaintiff, although we briefly address them because they may recur on retrial.

(a)
On plaintiff's in limine motion to exclude evidence of his car surfing (i.e. standing on the roof of a car), the trial judge permitted plaintiff's contradictory accounts at time of deposition and earlier to his physician because "truthfulness is always, always an issue." Accordingly, the judge limited use of this testimony to weighing plaintiff's credibility only. Thus, on cross-examination of plaintiff, defendant's counsel asked plaintiff whether he was car surfing:
Q: With respect to your telling me at deposition that you were on the trunk of the vehicle, did you ever tell Dr. Silver that you were on the roof of the vehicle?
A: No. Never.
Q: Did you ever tell Dr. Bernardini that you were on the roof of the vehicle?
A: No, sir.
Q: Were you on the roof of the vehicle?
A: No, sir.
Q: You sure about that?
A: I'm positive.
Then, two days later when examining defendant, his counsel inquired of a notation defendant made in plaintiff's medical records detailing plaintiff's version of the cause of his injury as "car surfing," told to defendant on the day of the incident:
Q: Could you tell our Jury what [plaintiff] told you about the mechanism of injury?
A: [Plaintiff] sustained an injury to his left arm while standing on a car that then moved. And then he flew off the car, landing on his left arm.
....
Q: [D]id [plaintiff], in terms of the words spoken to you, did [plaintiff] characterize that activity with any type of word description, as you recall?
A: The word description was car surfing, at the time.
Plaintiff's account to defendant is hearsay, N.J.R.E. 802, and admissible as a statement of a party opponent, N.J.R.E. 803(b), only if relevant. N.J.R.E. 401. Here, no claim is made by defendant that the statement related to either diagnosis or treatment. See e.g. N.J.R.E. 803(c)(4); Cestero v. Ferrara, 57 N.J. 497, 501, 273 A.2d 761 (1971); State v. McBride, 213 *447 N.J.Super. 255, 273, 517 A.2d 152 (App. Div.1986); Biunno, Current N.J. Rules of Evidence, comment on N.J.R.E. 803(c)(4) (2007); see also N.J.R.E. 805. Indeed, it would appear that the difference between falling from the trunk of a car, as plaintiff claims, and falling from the roof of a car, as plaintiff denies, is not significant enough to affect either diagnosis or treatment. Since the originating cause of plaintiff's underlying injury was non-essential and largely irrelevant to the critical issue of defendant's negligence, then both the specific and general effects of any contradiction on such a collateral matter have very little value. Mueller & Kirkpatrick, Evidence, § 6.62 at 677 (1995). As to its specific effect, the discrepancy defense counsel seeks to expose made no difference in the diagnosis and treatment of plaintiff's underlying injury and therefore is simply not useful. Of course, the more general effect remains: if plaintiff erred or lied about whether or not he was "car surfing," did he do the same on points that count for more, such as whether he voiced discomfort, pain or swelling on his post-operative visits to defendant? But the broader inferences of this sort are implausible without more, and we perceive nothing additional that bears on the substantive issues in this case to justify admission, as prior inconsistent statements, under N.J.R.E. 607, 613(b) or 803(a)(1). Indeed, under present circumstances, impeaching evidence cannot be used to support an inference that a witness has a "tendency" to be untruthful. Reinhart v. E.I. DuPont de Nemours, 147 N.J. 156, 166, 685 A.2d 1301 (1996).
Correspondingly, contradiction on such a collateral matter is especially likely here to inject prejudice. Thus, the critical issue is whether the worth of such evidence for impeachment purposes is of sufficient weight to overcome its prejudicial impact. Obviously, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of undue prejudice. N.J.R.E. 403. This balancing test applies whether or not the evidence is being admitted as direct evidence in the party's case-in-chief, or as indirect evidence for impeachment purposes. See Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 607 (2007) ("The use of extrinsic evidence to enhance or impair the credibility of a witness may generally be done by the party who called the witness as well as by an adverse party, although .... [t]he trial court still has discretion under N.J.R.E. 403 to exclude extrinsic evidence if the court finds that the probative value of the evidence is substantially outweighed by any of the counterfactors mentioned in that rule.").
Here, the height from which plaintiff fell, at best, was of marginal utility to the ligament damage he sustained. On the other hand, the fact of "car surfing" carries with it an enormous potential for prejudice suggesting as it does a reckless and practically wanton disregard for one's own safety. This balance, we believe, should have weighed in favor of excluding such evidence. However, whether the trial judge so palpably abused his discretion and its admission so wide of the mark that a manifest denial of justice resulted, we decline to say. It suffices that under identical circumstances on retrial, reference to car surfing should be disallowed.

(b)
We also need not decide whether the court's conduct of voir dire, which did not fully and technically comply with Directives #21-06 and #04-07 (Standards for Jury Selection) from the Administrative *448 Office of the Courts (AOC),[4] was in and of itself reversible error. Suffice it to say, although the judge admittedly failed to ask three open-ended questions of each prospective juror during voir dire, as required by Directive #04-07, plaintiff was somewhat complicit in the procedure ultimately employed. At the Rule 1:8-3 hearing, plaintiff never objected to the voir dire format used, and agreed to both the voir dire questions and the method for asking open-ended questions on follow-up, which would occur at sidebar after a juror answered a written voir dire question in the affirmative. During voir dire, plaintiff had ample opportunity to ask open-ended follow-up questions, but for the most part declined to do so, even when prompted by the judge. What is more, plaintiff argues that the judge's failure to ask the requisite open-ended questions prevented an inquiry into the prospective juror's views on damages and medical malpractice cases generally, despite the fact that those two issues were expressly inquired of the jurors in the voir dire questions. Again, plaintiff had agreed that the opportunity for asking open-ended questions on those issues would only occur if the jurors answered the relevant questions in the affirmative. Lastly, we note that the jury eventually empanelled ultimately returned a verdict of liability, finding defendant deviated from the professional standard of care.
We do not mean, in any way, to detract from the importance of following proper voir dire protocol, as provided in Directives #21-06 and #04-07. See State v. Morales, 390 N.J.Super. 470, 472-73, 915 A.2d 1090 (App.Div.2007). Indeed, the purpose of these Directives, which have been promulgated by the Supreme Court pursuant to its power to promulgate rules of administration as well as practice and procedure, is to empanel a jury without bias, prejudice or unfairness. Id. at 472, 475, 915 A.2d 1090. The requirements are imposed in order to "establish uniform practices" that will "`assure a thorough and meaningful inquiry into jurors' relevant attitudes....'" Id. at 473, 915 A.2d 1090. It follows, then, that a case should be reversed if it can be said that a "miscarriage of justice," R. 2:10-1, i.e. a biased jury, resulted from failing to follow those requirements.
On this score, we note that plaintiff's concerns raised on appeal appear legitimate. Directive #04-07 requires a biographical question, two qualifying omnibus questions, and three open-ended questions. For the most part, the only open-ended questions the judge asked any juror concerned explanations for being fair and impartial. However, the Directives contemplate that open-ended questions should touch on issues regarding the judicial system generally, while questions on the issue of fairness and impartiality veer toward what are considered omnibus qualification questions. Additionally, the jurors were *449 treated disparately. For instance, prospective juror 1 was never asked an open-ended question and counsel was never prompted for a follow-up, while prospective juror 20 was asked two, followed by a question from counsel. Indeed, mid-way through voir dire, plaintiff's counsel did voice concern with the paucity of dialogue that was occurring during voir dire, and wanted to ensure that questions would be asked in open-ended fashion.
While we consider it error not to have asked the requisite open-ended questions until a juror answered the initial voir dire question in the affirmative, we also recognize that a certain residual discretion resides in the trial judge to accommodate the individual circumstances of each case and the consensus views of counsel, even when doing so renders the voir dire procedure less than fully conforming to the Directives' mandates. For example, while use of the standard voir dire questions is mandatory, judges in their discretion may alter the sequence of the questions as they determine is appropriate, including whether to ask key challenge for cause questions early on, to incorporate questions suggested by counsel, or to integrate case type specific questions. In fact, the earlier Report of the 2004 Special Committee on Peremptory Challenges and Jury Voir Dire suggested that judges should not be required to follow a "rigid script" in conducting voir dire.
Here, plaintiff's counsel was seemingly satisfied with the court's voir dire questions, which included his requested inquiry into the prospective juror's views on damages, and was never prevented from asking follow-up questions. Although we venture no opinion as to whether the trial court's deviation from the strict requirements of these Directives constituted reversible error, we nonetheless caution that on retrial, jury voir dire conform to the dictates of the Directives, which are unquestionably binding on all trial courts.
Reversed and remanded.
NOTES
[1] Defendant further explained, however: "I don't want to give the impression that I had a non-stop radiographic x-ray going on because that's not safe for the patient or myself. You ask for a fluoroscopy when you want it."
[2] Where, as here, the claimed deviation from the accepted standard of care is the failure to perform a test, a plaintiff may present proof of "not only what did occur, but what might have occurred." Gardner, supra, 150 N.J. at 378, 696 A.2d 599 (quoting Evers, supra, 95 N.J. at 415, 471 A.2d 405 (emphasis in original)). Thus, Gardner held that to satisfy Scafidi's first prong, a plaintiff is not required to prove the results of tests that were not administered. Id. at 387, 696 A.2d 599. In the present context then, plaintiff was not required to prove that an x-ray would have revealed a dislocated elbow, but only that defendant's failure to perform an x-ray increased the risk that a condition that could cause plaintiff's permanent elbow disability would not be recognized, id. at 388, 696 A.2d 599; or in other words, that defendant's failure to perform an x-ray increased the risk that plaintiff would lose the opportunity for treatment at an earlier stage. See Verdicchio, supra, 179 N.J. at 32, 843 A.2d 1042. It is then the jury's responsibility to decide whether the increased risk resulting from a failure to test was or was not a substantial factor in causing the ultimate harm sustained. Ibid. Here, we conclude that plaintiff was entitled to have the jury charged in accordance with this principle as well.
[3] In this case, in addition to erroneously charging the "but for" test of proximate cause, the court briefly alluded to "substantial factor" terminology without any further elaboration or exposition of the two-part analysis, or any explanation how this legal principle relates to the facts of the case or the parties' respective contentions. We find that this mix-up of terms created real potential for jury confusion, Battenfeld, supra, 247 N.J.Super. at 548, 589 A.2d 1059, misapplied the proper legal standard, and may have led the jury to a different result than if correctly instructed. See Reynolds v. Gonzalez, 172 N.J. 266, 291, 798 A.2d 67 (2002).
[4] Directive #04-07, issued on May 16, 2007 and supplementing Directive #21-06 dated December 11, 2006, provides in pertinent part that

[s]ome open-ended questions must be posed verbally to each juror to elicit a verbal response. The purpose of [requiring the judge to ask open-ended questions] is to ensure that jurors verbalize their answers, so the court, attorneys and litigants can better assess the jurors' attitudes and ascertain any possible bias or prejudice, not evident from a yes or no response, that might interfere with the ability of that juror to be fair and impartial.... It is recognized that specific questions to be posed verbally might appropriately differ from one case to another, depending upon the type of case, the anticipated evidence, the particular circumstances, etc. Therefore, rather than designating specific questions to be posed verbally to each juror, the determination is left to the court, with input from counsel, in each case.